**UNITED STATES of America, Appellant and Appellee,**

v.

**Richard W. NORTON, Jr., Appellee and Appellant.**

**Richard W. NORTON, Jr., Appellee and Appellant,**

v.

**UNITED STATES of America, Appellant and Appellee.**

**No. 16691.**

United States Court of Appeals Fifth Circuit.

Jan. 9, 1958.

Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Morton K. Rothschild, Atty., Dept. of Justice, Washington, D. C., John N. Stull, Acting Asst. Atty. Gen., A. F. Prescott, Atty., Department of Justice, Washington, D. C., T. Fitzhugh Wilson, U. S. Atty., Meredith T. Holt, Asst. U. S. Atty., Shreveport, La., for appellant.

Cecil E. Ramey, Jr., Shreveport, La., W. B. Ferguson, Jr., Houston, Tex., for appellee.

Before BORAH, TUTTLE, and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal and cross appeal from a judgment in favor of a taxpayer by a District Court without a jury present three questions: (1) Is a payment by a transferree after termination of an inter vivos trust for his benefit, which payment represents a deficiency in income taxes owed by the trust prior to its termination and interest on such deficiency from the due date up to the date of termination, deductible by such transferree as a payment of interest on indebtedness or as an ordinary and necessary nonbusiness expense paid during the taxable year for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income? [1]  (2) Is a taxpayer precluded from taking losses on sales of stock which were accomplished on the stock exchange by his broker, under investment management authority, who simultaneously ordered the purchase of similar amounts of the same stocks for the account of taxpayer's mother from whom he held a similar but separate authority?  (3) Is a taxpayer precluded from taking a loss on a sale of stock made by the broker who ordered the purchase of an equal number of shares for his mother twenty eight days later at a slightly lower price when it is undisputed that he had no purpose or intent to make this later purchase at the time of the sale? [2]

For convenience the fact situation as to each issue will be stated in connection with the discussion of each claimed deduction.

## I.  The Interest Deduction

The taxpayer, Norton, was the sole income and principal beneficiary of an inter vivos trust created for him by his parents.  It terminated according to its terms on September 6, 1944, and all the corpus was turned over to him.  At that time there was pending an income tax dispute relating to the income of the trust for the year 1940.  Subsequently there arose a further dispute as to the

1. "§ 23.  Deductions from gross income. In computing net income there shall be allowed as deductions:

"(a) [As amended by Sec. 121(a) of the Revenue Act of 1942, c. 619, 56 Stat. 798] Expenses.—

\* \* \* \* \*

"(2) Non-trade or non-business expenses.  In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

"(b) Interest.  All interest paid or accrued within the taxable year on indebtedness \* \* \*."
26 U.S.C.A., 1952 ed., Section 23.

2. If these losses are to be disallowed it is under the provisions of Sec. 24 of the Internal Revenue Code of 1939 (as amended):

"§ 24. Items not deductible.

\* \* \* \* \*

"(b) Losses from sales or exchange of property

"(1) Losses disallowed.  In computing net income no deduction shall in any case be allowed in respect to losses from sales or exchanges of property, directly or indirectly—

"(A) Between members of a family, as defined in paragraph (2) (D);

\* \* \* \* \*

"(2) Stock ownership, family, and partnership rule.  For the purposes of determining, in applying paragraph (1), the ownership of stock—

\* \* \* \* \*

"(D) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;
\* \* \*."

trust's tax liability for the years 1942 and 1943. Norton made substantial payments on account of both of these adjustments, one in 1945 and one in 1946. Both of these payments made by him included amounts that represented interest on the respective deficiencies. This interest had accrued both prior to and subsequent to the date of termination of the trust and transfer of its corpus to Norton. The Commissioner allowed the part of taxpayer's claimed deduction of the interest payments that represented interest subsequent to date of termination, but disallowed the part that represented interest that had accrued at that date, or, in other words, the interest that would have been paid prior to termination if the trustee had paid in full its income tax obligations of the trust.

The taxpayer filed timely suit for refund of the sums which had been disallowed and on the trial the district court held for the taxpayer. The United States appeals from that part of the court's judgment.

We consider it appropriate to state several basic propositions in order to keep the precise issue here for decision in focus: (1) Deductions are statutory; they are not created by Treasury regulations or court fiat; (2) A trust is a taxpayer separate and apart from its beneficiary, and in the scheme of Federal taxation there may be, and frequently is, ample reason for maintaining this separate status in spite of apparent equitable consideration that might argue for ignoring it. (3) Frequently a deduction allowable under the statutes may not be used, and is thus unavailable to a taxpayer because of other circumstances relating to the particular tax year involved. (4) The duty to return and pay the correct tax rests on the taxpayer; thus he can derive no benefit from the failure of the Commissioner properly to assert deficiencies or assess additional taxes, so long as done within the statutory period.

The general rule of construction of the applicable section of the statute is that deduction may not be taken for an interest payment unless the interest is owed on an indebtedness of the one seeking the deduction. Commissioner v. Henderson's Estate, 5 Cir., 147 F.2d 619; Koch v. United States, 10 Cir., 138 F.2d 850; Nunan v. Green, 8 Cir., 146 F.2d 352. This general proposition we think is not challenged by Norton here, but he, apparently believing that the best defense is an offense, asserts that this principle has not been adjudicated in a case in which the transfer came from an inter vivos trust. He thus, with much skill, seeks to point out distinguishing features of the decided cases, principally relating to the nature of the transfer from the original debtor and taxpayer to the subsequent taxpayer who discharged the debt. This argument we think falls short of the mark. He has a heavy burden to show that his case is an exception to the rule. At the moment the trust here was terminated, there was an additional tax due for the years 1940, 1943 and 1944. There was also interest due on these tax obligations. At the instant the corpus of the estate was received by the beneficiary of the trust there was a charge against it on the *gross* amount of past due unpaid taxes and accrued interest. From that time on the distinction between the principal amount of the taxes and the accrued interest was as completely lost as is that between a charge for past due taxes on real estate and the rest of the purchase price when by contract a purchaser agrees to pay the taxes as part of the price.

"A tax lien is an encumbrance upon the land, and payment, subsequent to purchase, to discharge a pre-existing lien is no more the payment of a tax in any proper sense of the word than is a payment to discharge any other encumbrance, for instance a mortgage. It is true that respondents here could not have retained the properties unless the taxes were paid, but it is also true that they could not retain them without paying the purchase price. It is no answer therefore to say that the

property was burdened with the taxes and that respondents became obligated to pay them. There was a burden, but it was contractually assumed. In discharging this assumed obligation respondents were not paying taxes imposed upon them within the meaning of Section 23(c). For 'only the person owning the property at that time (i. e., when the tax lien attaches) is subjected to the burden which the law imposes; and only the person who has been thus subjected to the burden of the tax is entitled to a deduction for paying it' * * *." Magruder v. Supplee, 316 U.S. 394, 398, 62 S.Ct. 1162, 1165, 86 L.Ed. 1555.

The payment later made by the taxpayer to recover the principal amount of the unpaid taxes and the interest accrued to the date of the transfer was merely a payment of the gross sum that the Government was permitted by the transferee statute [3] to assert against the transferee. Payments made by him were not susceptible of being broken into principal and interest in order to make the interest payments deductible.

This precise point has twice been adjudicated by this Court, Commissioner v. Henderson's Estate, supra; W. D. Haden Co. v. Commissioner, 5 Cir., 165 F.2d 588. To be sure one of these is an estate tax case and the other is a corporation liquidation case, but we think the answer to the question whether interest is or is not on the "indebtedness" of the transferee is no different here than it was in the two cases cited.

■ Much of the taxpayer's argument here is directed against the Government's assertion that the amount which the Commissioner has here disallowed will not be totally lost to the taxpayer in the computation of his taxes, because it will represent added cost to determine the basis of the assets on subsequent sale. We have already indicated that the inability of a taxpayer to obtain full advantage of a deduction creates no corresponding equity in his favor that can be satisfied only by his getting some other tax advantage. We do not come to the question as to the effect on basis of the payments of the taxpayer of the interest that had accrued prior to September 6, 1944. This problem is not before us for decision, and its resolution does not aid us in deciding the issue that is before us. We hold only that he may not deduct these payments as "interest paid on indebtedness" during the years 1945 and 1946.

We have read with interest the taxpayer's analysis of the other decisions of the Tax Court and the Courts of Appeals of the other judicial circuits relating to interest deductions. None of them support the taxpayer's contention here and none of them can be taken by us to justify our departing from the prior holdings of this Court in the Henderson and Haden cases, supra.

■ The trial court erred also, we think, in its application of the "Nontrade or non-business expense" provisions of the Code to the interest payments here. From what has been said above it is apparent that this payment was no more an "expense" item than was the

3. "§ 311. Transferred assets.
"(a) Method of collection. The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):

"(1) Transferees. The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.
*      *      *      *      *
"(f) Definition of 'transferee'. As used in this section, the term 'transferee' includes heir, legatee, devisee, and distributee." 26 U.S.C.A., 1952 ed., Sec. 311.

principal amount paid for the past due taxes. Both items together constituted a gross charge against the transferred assets, and neither, when paid, could be deducted as a non-business expense "paid * * * for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." 26 U.S.C.A. (1952 ed.) § 23(a) (2).

## II. The Short-Term Losses

We come now to the appeal by Norton from that part of the judgment below that upheld the Commissioner's disallowance of losses on the sale of certain securities.

During the year 1946 Norton had $5,000,000 of securities in a custodial account in a New York bank. It was required to make sales and purchases of this account upon instruction of investment counsel, one Rogers, who was instructed to and did in all matters here relevant, act without approval of Norton.

An identical relationship existed between Norton's mother, the bank and Rogers as to the handling of $2,000,000 of Mrs. Norton's securities. Neither Norton nor his mother had any right or control over the securities of the other and Rogers followed separate and independent investment policies as to each.

On September 26, 1946, Rogers had the bank sell through the New York Stock Exchange substantial numbers of shares belonging to Norton in four companies; on the same day he had the bank buy for his mother's account substantial numbers of shares of stock in the same companies; in two instances the purchases were for the same number sold by Norton; in the other two for 700 as against 1,000 and 300 as against 600 respectively.

Rogers testified that he made the sales for Norton in order to take short term losses for tax purposes and that he made the purchase for Mrs. Norton, the mother, because he considered the stocks

at the then prices good investments for her account.

The disallowance by the Commissioner of the losses claimed by the taxpayer against long term capital gains was based on Section 24 of the Internal Revenue Code of 1939, as amended.[4] The question here then is whether these sales are sales "directly or indirectly * * * between" Norton and his mother.

This phase of the case is ruled, we think, by McWilliams v. Commissioner, 331 U.S. 694, 67 S.Ct. 1477, 1480, 91 L.Ed. 1750. The Supreme Court there held that Congress intended to do more than meet the evidentiary problem presented by the then state of the law which made such sales vulnerable only if not made in "good faith." The Court said:

"Moreover, we think the evidentiary problem was not the only one which Congress intended to meet. Section 24(b) states an absolute prohibition—not a presumption— against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intragroup transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

> *    *    *    *    *    *

"We conclude that the purpose of § 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers and other designated devices, their own time for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.

"We are clear as to this purpose, too, that its effectuation obviously had to be made independent of the

---

4. See footnote 2, supra.

manner in which an intra-group transfer was accomplished. Congress, with such purpose in mind, could not have intended to include within the scope of § 24(b) only simple transfers made directly or through a dummy, or to exclude transfers of securities effected through the medium of the Stock Exchange, unless it wanted to leave a loop-hole almost as large as the one it had set out to close." McWilliams v. Commissioner, 331 U.S. 694, 699, 700, 67 S.Ct. 1480.

■■ The sales that were disallowed in the McWilliams case were made by the husband acting for himself and his wife who had her independent estate; the sales and purchases were ordered simultaneously, as was the case here; they were executed on the New York Stock Exchange. We think it clear that the presence of Mr. Rogers, the investment counsel in this case, instead of the husband in the McWilliams case, does not make inapplicable the principle there announced. By prearrangement (i. e., simultaneous instructions to sell and buy the same securities) Rogers sold Norton's stocks and bought them for Mrs. Norton. It is immaterial what the motives were because, as the Supreme Court said:

"Section 24(b) states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups."

The trial court correctly sustained the Commissioner's action in disallowing these losses.

■ We come finally to the third question which arises from the disal-

lowance by the Commissioner of the sale by Norton of 800 shares of Magma Copper stock on August 30, 1946, at prices $20—20⅛ per share because his mother acquired 800 shares of Magma Copper on September 27th at $19, there being no simultaneous order to purchase for Mrs. Norton when Rogers ordered the sale for the taxpayer and it being undisputed that there was no concurrent contemplation of such purchase at the time of the sale.

The trial court did not distinguish between the Magma Copper transaction and those in which the purchase and sale were executed simultaneously. The Government does not discuss this distinction. The taxpayer, both in the trial court and here, emphasizes the differences between the Magma Copper transactions and the others discussed above. We think these distinctions are significant, and that factual differences require different treatment.

No time limit is stated in the statute with which we are here concerned; that is to say the prohibition against recognizing the loss applies to any direct or indirect sale between the related persons. It differs in this respect from the wash sales provision of the Code.[5] The Supreme Court commented on the difficulty arising from the omission from the statute of any period of time during which the acquisition by one member of the related group of the same stock sold by another member would bring the disallowance of a loss into play; but the Court did not there need to pass on that question other than to say that such omission did not prevent the Court from construing the statute to apply to the simultaneous sale and purchase trans-

5. "§ 118. Loss from wash sales of stock or securities.

"(a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the tax-

payer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed * *." 26 U.S.C.A., Internal Revenue Code, 1939, as amended, § 118.

actions there involved. Nor do we have to decide where the line should be drawn in any case other than the one before us. Normally there can be a sale from A to B only at a single point of time, whether that sale be direct or indirect. The Supreme Court has held that such a sale and purchase exist when an order is given simultaneously for sale by A and purchase by B, to be executed on the stock exchange contemporaneously. That is what was done with respect to Norton's other sales. It has not been held, and we do not think it can be, that such sale and purchase exists when A sells on the market and no action is taken or contemplated for 28 days, at which time B determines to buy the same amount of stock and does so at a different price. The fact that there is a complete break in the control by the members of the related group prevents this purchase from being a sale *between* A and B, either direct or indirect. Of course, Congress could extend the wash sales prohibitions to purchases by related persons if it saw fit to do so, but it has not accomplished this result in Section 24(b). Dealing only with the facts here, we must hold that a sale of fungible stocks by Norton on August 30th, followed by the purchase by his mother 28 days later at a lower price was not a sale or exchange of property directly or indirectly between son and mother, within the contemplation of Section 24(b).

The judgment of the trial court is affirmed to the extent that it disallowed losses on the disputed sales other than the Magma Copper stock; it is reversed as to its disallowance of the loss resulting from the sale of that stock. It is also reversed to the extent that it allowed the deduction of the interest accrued prior to the termination of the trust.

Remanded for further proceedings not inconsistent with this opinion.

CAMERON, Circuit Judge.

I concur in the result.