James H. MERRITT, Sr., and Amanda Merritt, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 25123.

United States Court of Appeals Fifth Circuit.

Aug. 23, 1968.

Donald G. Tripp, Oxford, Mich., for petitioners.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Jonathan S. Cohen, Donald A. Statland, Willy Nordwind, Jr., Attys., Dept. of Justice, Lester R. Uretz, Chief Counsel, I.R.S., Eugene F. Colella, Atty., I.R.S., Washington, D. C., for respondent.

Before GOLDBERG, GODBOLD and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

This case presents the question of whether a loss sustained by an individual taxpayer after the involuntary sale of stock owned in a family corporation is deductible when the purchaser was the taxpayer's wife. Both the appellants and the government agree that the loss was validly deducted unless Section 267 of the Internal Revenue Code of 1954—transactions between related taxpayers—is applicable.[1] The Tax Court held that

---

1. 26 U.S.C. § 267:
   "(a) Deduction disallowed.—No deduction shall be allowed—

(1) *Losses.*—In respect of losses from sales or exchanges of property (other than losses in cases of distribu-

Section 267 is not restricted to voluntary sales as advocated by the appellants here, but also encompasses involuntary sales between members of a family. We affirm.

During the early 1940's the appellants, James H. Merritt, Sr., and Amanda Merritt, and their two children operated as a family partnership a wholesale plumbing business in Utica, Michigan. On July 1, 1947, the partnership acquired corporate status under the name of Nu-Way Supply Company, Inc. Upon incorporation each of the former partners received shares of stock substantially equal in par value to his respective basis in the partnership assets.

In April, 1952, the Internal Revenue Service assessed income tax deficiencies, plus additions for tax fraud, against each of the stockholders in Nu-Way Supply Company for tax liabilities which had accrued during 1944, 1945, and 1946, while the business was operating as a partnership. Although Amanda Merritt and her two children admitted the validity of the assessment and paid the tax, as of July, 1960, a claim in the amount of $191,812.98 [2] plus interest was still outstanding against James H. Merritt, Sr.

On August 2, 1960, a notice of levy was served on James H. Merritt, Sr., for the purpose of seizing and selling his shares of Nu-Way stock and applying the proceeds of the sale to his tax liability. On October 24, 1960, Merritt delivered his preferred and common shares of Nu-Way to an officer of the Internal Revenue Service. On November 4, 1960, a notice of public auction was published describing the property which was to be sold on November 14, 1960, as "only the right, title and interest of J. H. Merritt, Sr." in the shares of the seized Nu-Way stock.

During the interim ten-day period between the date of notice and the date of sale, the appellants received advice from a revenue officer as to how they might acquire the stock. Acting upon this advice, the appellants negotiated a loan from the National Bank of Detroit, and on November 14, 1960, all of the shares owned by James H. Merritt, Sr. were sold for $25,000 to Amanda Merritt (who was the only bidder at the public auction). A certificate of sale of the seized property was executed by the revenue officer and was given to Amanda Merritt as purchaser.

On their joint federal income tax return for 1960, the appellants reported a long-term capital loss from the sale of stock owned by James H. Merritt, Sr. to Amanda Merritt. Since the basis of the stock had been $135,000, the purported loss resulting from the transaction amounted to $110,000. The appellants reported $9,187.49 of this amount on their 1960 tax return to offset their short-term and long-term capital gains for the year and deducted $1,000 of the unabsorbed loss against other income on their tax return for the year 1960. The Commissioner, however, disallowed the deductions on the theory that the loss was the result of an intra-family transfer under Section 267.

In March, 1967, the Tax Court, confronted with divergent statutory con-

tions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

    \*    \*    \*    \*    \*

(b) *Relationships.*—The persons referred to in subsection (a) are:

    (1) Members of a family, as defined in subsection (c) (4);

    \*    \*    \*    \*    \*

(c) *Constructive ownership of stock.* —For purposes of determining, in applying subsection (b), the ownership of stock—

    \*    \*    \*    \*    \*

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; "

2. The Internal Revenue Service assessed the tax in the following manner:

$104,815.77
77,769.53    1945 deficiency
9,227.68    1944 deficiency

$191,812.98

structions, was unable to reach unanimous agreement as to the applicability of Section 267. Merritt v. Commissioner, 1967, 47 T.C. 519. Chief Judge Tietjens, writing for eight members of the majority, held that Section 267 does not depend upon whether the sale is a sham, or lacks bona fides, or is involuntary, or is a forced or judicial sale. The sole determinant, he postulated, is whether the loss results from a sale, directly or indirectly, between spouses. Judge Raum, in a concurring opinion joined by three judges including Chief Judge Tietjens, stressed the similarity of economic interest before and after the sale, which, if ignored, he believed would severely limit the scope of the legislation. In a dissenting opinion Judge Dawson, with whom four judges agreed and upon whom the appellants rely heavily in their legal argument before this Court, discussed the legislative history of Section 267 and concluded that *willful* intra-family manipulations by taxpayers were the only loopholes which Congress had in mind when the Section became law.

We begin our discussion by explicitly assuming that this transaction was an *involuntary sale* from which the appellants gained no benefit other than the extinction of the tax liability. In order to affirm the Tax Court's decision, therefore, we must conclude that Congress sought to deny the privilege of deducting the loss in all intra-family transactions, not only those where the taxpayer has actively attempted tax-avoidance.

Section 267 of the 1954 Code corresponds to Section 24(b) of the 1939 Code in denying losses and certain expense and interest deductions between related taxpayers.[3] These provisions close the loophole in pre-1939 tax law which had encouraged taxpayers to shuttle assets back and forth between members of a related group in order to acquire the deduction privilege.[4]

The scope of Section 24(b) of the 1939 Code was discussed in the insightful decision of McWilliams v. Commissioner of Internal Revenue, 1947, 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750. In that case the petitioners sought to deduct losses incurred when stocks were sold on the open market. John P. McWilliams had for a number of years managed the estate of his wife. On several occasions he had ordered his broker to sell certain shares of stock owned by either him or his wife, and to buy the same number of shares of the identical stock for the other. The Commissioner disallowed for tax purposes the resulting losses, and McWilliams appealed. Before the Supreme Court McWilliams argued, as do the appellants in this case, (1) that title changed hands with an intermediate owner between him and his wife, and (2) that the parties were acting in good faith. The Court met these arguments with the following language:

"Moreover, we think the evidentiary problem was not the only one which Congress intended to meet. *Section 24(b) states an absolute prohibition— not a presumption—against the allowance of losses on any sales between members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interest. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.*

"The pertinent legislative history lends support to this inference. The Congressional Committees, in reporting the provisions enacted in 1934, merely stated that 'the practice of

---

3. For an excellent discussion of Section 267 as it relates to the 1939 Code, see Kutz, "Transactions Between Related Taxpayers," N.Y.U. 13th Annual Institute on Federal Taxation 69 (1955).

4. For examples of cases which led to the passage of this legislation, see Shoenberg v. Commissioner of Internal Revenue, 8 Cir. 1935, 77 F.2d 446, and Cole v. Helburn, W.D.Ky.1933, 4 F.Supp. 230.

creating losses through transactions between members of a family and close corporations has been frequently utilized for avoiding the income tax,' and that these provisions were proposed to 'deny losses to be taken in the case of such sales' and 'to close this loophole of tax avoidance.' Similar language was used in reporting the 1937 provisions. Chairman Doughton of the Ways and Means Committee, in explaining the 1937 provisions to the House, spoke of 'the artificial taking and establishment of losses where property was shuffled back and forth between various legal entities owned by the same persons or person,' and stated that 'these transactions seem to occur at moments remarkably opportune to the real party in interest in reducing his tax liability but, at the same time allowing him to keep substantial control of the assets being traded or exchanged.'

*"We conclude that the purpose of Section 24(b) was to put an end to the right of taxpayers to choose, by intrafamily transfers and other designated devices, their own time for realizing tax losses on investments which, for most practical purposes are continued uninterrupted.*

*"We are clear as to this purpose, too, that its effectuation obviously had to be made independent of the manner in which an intra-group transfer was accomplished."* McWilliams v. Commissioner of Internal Revenue, 331 U.S. at 699–700, 67 S.Ct. at 1480, 1481 (Emphasis added.)

█ The Supreme Court in *McWilliams* refused to be diverted into the niceties of either sequence of title or voluntary versus involuntary sales. Instead, the Court recognized that Congress sought to regulate these transfers "independent of the manner in which an intra-group transfer was accomplished" and thereby to preclude all tax losses from sales of property directly or indirectly between members of a family. The corollary readily follows that Section 267 is not to be aborted by engrafting the words "voluntary" and "nonconduit" on the present sales terminology.[5]

Although we believe that Congress and the Supreme Court have spoken clearly on the question, we recognize that two Circuits have reached decisions on involuntary sales which are contra to what we hold here. McNeill v. Commissioner of Internal Revenue, 4 Cir. 1958, 251 F.2d 863, cert. den., 358 U.S. 825, 79 S. Ct. 43, 3 L.Ed.2d 65, and McCarty v. Cripe, 7 Cir. 1953, 201 F.2d 679. The Court in *McNeill* held that title passed from the taxing authority to the ultimate purchaser, thereby breaking the chain of continuous ownership. We believe this decision was incorrect for two reasons. First, the Supreme Court in *McWilliams* was also faced with a situation where title had changed hands through an intermediate party. In fact, in *McWilliams* the parties did not get the same identical stock certificates as were sold. Nevertheless, the Court looked past the form of the sale to the substance which showed that the *same economic interest* was retained. Second, the *McNeill* Court relied only on that part of the *McWilliams* decision which spoke of the prevention of taxpayers choosing their own time to realize a tax benefit. This rationale may have been one of the primary factors in the passage of the legislation and may have been applicable to the *McWilliams* facts, but it does not alter the broad sweep of the language quoted above which outlines a far more general coverage.

---

5. Cf. Helvering v. Hammel, 1941, 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303, in which the Court stated: "We can find no basis in the language of the Act, its purpose or its legislative history, for saying that losses from sales of capital assets under the 1934 Act, more than its predecessors, were to be treated any differently whether they resulted from forced sales or voluntary sales."

The *McCarty* decision involved a forced sale in which the loss deduction was allowed. Pretermitting a similar critique of that case, we note that a factual foundation for the ruling was the finding by the Court that "the property was purchased at a public sale where the bidding was spirited, and there is a strong presumption that it sold for not less than its fair value." McCarty v. Cripe, 201 F.2d at 682. To the contrary, in this case Mrs. Merritt was the sole bidder at the public auction. (As, in fact, the Merritts had planned the sale of 20% common stock ownership in a closely-held corporation did not excite public bidding.)

The appellants cannot effectively deny that, in regard to the stock in question, they retained continuous *control* and *identity of interest*.[6] We find these factors to be the ones which the Supreme court highlighted in *McWilliams*. Moreover, in a prior decision by our own Court we reviewed in detail the philosophy of *McWilliams* and then noted: "It is immaterial what the motives were." United States v. Norton, 5 Cir. 1958, 250 F.2d 902, 908.

We do not read Section 267 as seeking out devils alone. The basic legislative command of the section is that losses incurred from family transactions are not to be taxable events. This blanket approach relieves the taxing authorities of many complicated and complex melioristic decisions in family transactions. Though we do not applaud harsh results (though defining the result in this case as "harsh" would be no easy task), we recognize that simplicity can be a valid congressional rationale for banning transactions by type. The judgment of the Tax Court is accordingly

Affirmed.

---

6. The appellants have raised an unconvincing plea arguing that, during the period between seizure and sale, control and interest in the stock passed to the I.R.S. and the Merritts became strangers to the seized stock. Included in this plea is a form of estoppel argument, which implies that the appellants were misled by the advice of the Revenue Agent. It is obvious that control and interest, for tax purposes, remained with the Merritts especially when the above facts are compared with those in *McWilliams*. Moreover, we do not see why the benevolence of the Revenue Agent in suggesting to the Merritts how they could retain their interest in Nu-Way should bind the Commissioner as an assurance that they would escape the confines of Section 267.