E. E. HASSEN AND B. B. HASSEN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1544-68, 3686-68, 3687-68, 4030-68, 4066-68, 4182-68.    Filed November 13, 1974.

---

[1] Cases of the following petitioners are consolidated herewith: Erwin E. Hassen and Birdie B. Hassen, docket Nos. 3686-68 and 4030-68; Vinemore Company, Inc., docket Nos. 3687-68 and 4066-68; and Towne Avenue Hospital & Sanitarium, docket No. 4182-68.

*Richard K. Seltzer* and *Robert E. Weiner,* for the petitioners.
*Richard H. Gannon,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax and additions thereto under sections 6651(a) and 6653(a), I.R.C. 1954,[2] as follows:

| Petitioner | Docket No. | Year | Deficiency | Addition to tax Sec. 6651(a) | Sec. 6653(a) |
|---|---|---|---|---|---|
| E.E. Hassen and B.B. Hassen | 1544-68 | 1965 | $4,764.00 | | |
| Erwin E. Hassen and Birdie B. Hassen | 3686-68 | 1959 | 73,177.85 | | $3,658.89 |
| | | 1961 | 2,156.85 | | 107.84 |
| | | 1962 | 189,795.65 | | 9,489.78 |
| Erwin E. Hassen and Birdie B. Hassen | 4030-68 | 1963 | 24,859.68 | | 1,242.98 |
| Vinemore Co., Inc. | 3687-68 | FY ending 8/31/62 | 69,601.05 | | |
| | 4066-68 | FY ending 8/31/63 | 17,114.50 | | 855.73 |
| | | FY ending 8/31/64 | 31,539.17 | | 1,576.96 |
| Towne Avenue Hospital & Sanitarium | 4182-68 | 1962 | 10,000.00 | $500.00 | 500.00 |
| | | 1963 | 11,259.07 | 562.95 | 562.95 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following:

(1) Whether section 267(a)(1) prohibits the deduction by petitioners Erwin E. and Birdie B. Hassen of a loss on the foreclosure during 1961 upon real property which was a community asset where the property was purchased at the trustee's sale by the foreclosing party and pursuant to a prior agreement transferred to a corporation owned by petitioners and members of their immediate family.

(2) Whether petitioner Vinemore Co., Inc., is entitled to deduct for its fiscal year ending August 31, 1964, rental payments for Civic Center Hospital in the amount of $48,000.

---

[2] All references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of the filing of their petitions in this case E. E. (E. E.) and B. B. (B. B.) Hassen, husband and wife, were residents of Los Angeles County, Calif. They filed joint Federal income tax returns for the calendar years 1959 through 1963 with the office of the district director of internal revenue at Los Angeles.

Vinemore Co., Inc. (Vinemore), was a California corporation. At the time it filed its petitions in this case, it had its principal office in Los Angeles, Calif. It filed Federal corporate income tax returns for the period October 17, 1957, through August 31, 1958, and for its fiscal years ending August 31, 1959, through August 31, 1964, with the office of the district director of internal revenue at Los Angeles.

Towne Avenue Hospital & Sanitarium (Towne) was a California corporation. At the time it filed its petition in this case, its principal office was in Los Angeles, Calif. It filed Federal corporate income tax returns for the calendar years 1962 and 1963 and filed an amended return for the calendar year 1963 with the office of the district director of internal revenue at Los Angeles.

U.L.C. Corp. (U.L.C.) and B.J.S. Corp. (B.J.S.) were California corporations.

Vinemore utilized an accrual basis of accounting while Towne, U.L.C., B.J.S., and E. E. and B. B. utilized the cash basis at all times here material.

All the shares of stock of each of the above corporations, Vinemore, Towne, U.L.C., and B.J.S., were owned at all times here material by E. E. and B. B., their daughters, their brothers, and their sisters.

## Issue 1

On March 18, 1955, E. E. and B. B. purchased Golden State Hospital (Golden State), for $975,000. Although this property was a community asset, B. B. was the nominal owner of Golden State. Subsequent to 1955, E. E. borrowed moneys from his sister, Betty Stein, and B. B. as the nominal owner executed a note and trust deed pledging Golden State to secure the loan. In 1958, Betty Stein transferred the note and trust deed to Pacific

Thrift & Loan Co. (Pacific Thrift) as an accommodation to E. E. in connection with his sale in 1958 of shares of stock of Pacific Thrift. Since 1958 E. E. has not owned any interest in Pacific Thrift.

Commencing in 1960 Pacific Thrift exerted pressure on E. E. and B. B. to make payments on the note which was in default and threatened foreclosure. In November 1960, Pacific Thrift served a notice of foreclosure upon E. E. and B. B. pursuant to State law. E. E., who had been seeking financing to cure the default, was able to obtain several extensions. In May 1961, Pacific Thrift was forced to foreclose by virtue of the pressure exerted on it by the California Corporations Commission. The trustee's sale took place on May 31, 1961, and Pacific Thrift was the only bidder, purchasing Golden State for $46,300 which amount was equal to the outstanding balance of the note. Pacific Thrift acquired legal title to Golden State as of May 31, 1961. E. E. and B. B. Hassen's adjusted basis in Golden State was $524,125.44 at the time of the trustee's sale.

During a discussion between E. E. and Mr. Beidner, an officer of Pacific Thrift, a few days prior to May 31, 1961, Mr. Beidner stated that if E. E. did not cure the default and it became necessary to foreclose, and if Pacific Thrift bought Golden State at the trustee's sale, Pacific Thrift would give E. E. or an entity specified by him the first right to purchase Golden State from Pacific Thrift for the amount outstanding on the defaulted note plus foreclosure costs. This right to purchase was contingent upon E. E.'s ability to borrow the purchase price within 90 days of the trustee's sale.

On June 5, 1961, U.L.C. and Pacific Thrift entered into an escrow agreement obligating U.L.C. to purchase Golden State [3] unless it was unable to obtain financing. The purchase price was $70,000, which amount equaled the amount outstanding on the defaulted note and the costs incurred by Pacific Thrift on the foreclosure. On August 30, 1961, the sale was consummated and Pacific Thrift conveyed the legal title of Golden State by grant deed to U.L.C.

Petitioners E. E. and B. B. in their return for the calendar year 1961 noted that they had sustained a loss on the foreclosure of

---

[3] Although the parties' stipulation refers to U.L.C.'s obligation to purchase "Pacific Thrift," the stipulation as a whole and the briefs of the parties make it clear that U.L.C.'s obligation was to purchase "Golden State."

Golden State during that year but did not claim a loss as the amount of the loss was uncertain at that time due to "pending litigation." In their return for the calendar year 1962 petitioners did claim a "depreciation or operating loss on Golden State" of $431,382.60. Respondent disallowed this claimed deduction in its entirety with the explanation that "a foreclosure loss, depreciation or operating loss on Golden State Hospital claimed in your 1962 return in the amount of $431,382.60 (and subsequently claimed in a protest to be a foreclosure loss of $524,125.53 in 1961) is not allowable because it has not been established that you are entitled to deduct such amount."

## Issue 2

In early 1963 E. E. negotiated a sublease of the premises at 1925 Trinity Street known as American Hospital from the lessee, Trinity Washington Services, Inc. (Trinity), which was owned by George Finerman. The rental payments were to be at the rate of $4,000 per month but Trinity required an initial advance payment of $12,000 for 3 months' rent. In satisfaction of this requirement, E. E. drew a check, dated April 26, 1963, payable to Trinity in the amount of $12,000 on an account of U.L.C. This check had the notation that it was for "Rent for months July, August and September 1963 for premises of American Hospital as per lease agreement" and was endorsed by Trinity. This check was given by E. E. in the presence of E. E.'s brother, Nathan Hassen (Nathan), to George Finerman, representing Trinity.

In July 1963 the hospital opened under the name of Civic Center Hospital (C.C.) with Nathan as its administrator. C.C. was operated on behalf of Vinemore by the 1925 Corp., a newly formed corporation, to which Trinity had assigned its city license.

E. E. maintained a clinic nearby at 1900 Trinity.

C.C. had two checking accounts to which receipts of the hospital would be deposited. Nathan and C.C.'s accountant were authorized to draw upon these accounts. As the administrator of C.C., Nathan's duties included paying its operating expenses and on two occasions he drew a check in the amount of $4,000 against a C.C. account to pay the monthly rent. Nathan considered that this account belonged to Vinemore.

C.C. was financially unsuccessful and to meet its expenses it had to seek additional capital from E. E. and his controlled

corporation, U.L.C. Either E. E. or U.L.C. would furnish moneys directly to C.C., which would then pay its expenses, or indirectly by paying C.C.'s expenses. E. E. gave four separate checks to Finerman, each of which was to pay for a month's rent of C.C. On C.C.'s books of account there were entries for accounts payable to U.L.C. C.C. ceased to operate in December 1965.

C.C. and Golden State are located on separate premises. Vinemore had not claimed any deductions for rental expenses in any of its returns for its fiscal years 1957 through 1963.

Vinemore on its return for its fiscal year 1964 reported total income of $290,593 composed of gross receipts of $154,465, interest income of $135,500, and royalties of $628. It claimed total deductions of $313,681 of which $54,179 was designated as salaries and wages, $52,330 as rent, and $114,984 as "other deductions," which amount was itemized as follows:

| Item 26, other deductions | Amount |
|---|---|
| Drugs, medical supplies, X-ray, laboratory | $34,126 |
| Food and kitchen supplies | 11,112 |
| Auto expense | 3,789 |
| Legal and audit | 2,910 |
| Management expense | 24,900 |
| Linen, laundry, housekeeping | 6,405 |
| Employees' health and welfare | 1,564 |
| Insurance | 2,342 |
| Telephone | 4,817 |
| Utilities | 7,378 |
| Stationery, postage, office supplies | 1,728 |
| Miscellaneous expense | 13,913 |
| Total other deductions | 114,984 |

Respondent in his notice of deficiency determined that Vinemore had a net profit from the operation of C.C. in its fiscal year 1964 with the following explanation:

It is determined that a net profit of $2,778.51 was sustained during taxable year ended Aug. 31, 1964, from operations of Civic Center Hospital rather than a loss of $21,366.00 as claimed on the return. Taxable income is, therefore, increased by $24,144.51, computed as follows:

| | Per return | Per revised profit and loss statement submitted by corporation's accountant |
|---|---|---|
| Gross receipts | $154,465 | $214,921.80 |
| Deductions: | | |
| Bad debts | None | 10,125.80 |
| Salaries and wages (nursing and operating room) | 54,179 | 51,085.86 |
| Repairs | 2,679 | (¹) |
| Taxes | 3,624 | 7,219.86 |
| Depreciation | 365 | 172.96 |
| Drugs, medical supplies, X-ray and laboratory (also emergency room and medical records) | 34,126 | 44,840.23 |
| Food and kitchen supplies (dietary) | 11,112 | 18,446.68 |
| Auto expense | 3,789 | 3,789.00 |
| Legal and audit | 2,910 | 2,910.00 |
| Management or administrative expense | 24,900 | 48,540.79 |
| Linen, laundry, and housekeeping | 6,405 | (¹) |
| Employees' health and welfare | 1,564 | 1,724.39 |
| Insurance | 2,342 | 4,304.68 |
| Telephone | 4,817 | (¹) |
| Utilities | 7,378 | (¹) |
| Stationery, postage, and office supplies | 1,728 | |
| Miscellaneous expense (contractual and administrative allowances and interest) | 13,913 | 8,179.99 |
| Housekeeping | None | 7,681.33 |
| Maintenance | None | 3,121.72 |
| Total deductions | 175,831 | 212,143.29 |
| Net profit (loss) | (21,366) | 2,778.51 |
| Net increase in taxable income | | 24,144.51 |

¹ Revised amounts for these items are included under housekeeping and maintenance expenses. Rent expense is shown as a separate adjustment, item (d).

The following statement appeared under item (d) in this notice of deficiency to Vinemore for its fiscal year 1964:

The deduction of $52,330.00 claimed in taxable year ended August 31, 1964, for rental of Golden State Hospital is allowed to the extent paid, or $12,333.35; the balance of $39,996.65 represents an accrual for which there is no evidence of liability, or an accrual which was not paid within two and one-half months after the close of the taxable year, and is unallowable under the provisions of section 267 of the Internal Revenue Code of 1954.

OPINION

## Issue 1

Section 267 provides for the disallowance of deductions for losses from sales or exchanges of property between certain related parties.[4] The parties agree that petitioners E. E. and B. B. sustained a loss in the amount of $477,825.44 as a consequence of the foreclosure sale of Golden State, their community asset. The issue between the parties is whether this otherwise allowable deduction for a loss is precluded by section 267(a)(1).

Petitioners contend that section 267(a)(1) is not applicable as their loss resulted from the sale of Golden State to Pacific Thrift which is not a person with the relationship to them designated under the statute, relying on *McCarty v. Cripe,* 201 F. 2d 679 (C.A. 7, 1953); *McNeill v. Commissioner,* 251 F. 2d 863 (C.A. 4, 1958), reversing 27 T.C. 899 (1957). Further, they argue that the subsequent sale of Golden State from Pacific Thrift to U.L.C. was a separate and independent sale, unrelated to the prior sale between petitioners and Pacific Thrift, relying on *Commissioner v. Gordon,* 391 U.S. 83 (1968); *American Bantam Car Co.,* 11 T.C. 397 (1948), affirmed per curiam 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950). Petitioners

---

[4] SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.

(a) DEDUCTIONS DISALLOWED.—No deduction shall be allowed—

(1) LOSSES.—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).
* * *

(b) RELATIONSHIPS.—The persons referred to in subsection (a) are:
* * *

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;
* * *

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—For purposes of determining, in applying subsection (b), the ownership of stock—
* * *

(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;
* * *

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and

(5) * * * stock constructively owned by an individual by reason of the application of paragraph (2) or (3) shall not be treated as owned by him for the purpose of again applying either of such paragraphs in order to make another the constructive owner of such stock.

emphasize that Pacific Thrift, an independent third party, owned and controlled Golden State for 5 days between May 31 and June 5, 1961, and distinguish *Merritt v. Commissioner,* 400 F. 2d 417 (C.A. 5, 1968), affirming 47 T.C. 519 (1967), on the ground that it involved a singular sale between persons designated under the statute.

Respondent contends that in substance there was a sale between petitioners and U.L.C., each of whom was a member of the specified group under the statute, and that the loss arising from the sale is disallowed under section 267(a)(1). Respondent contends that no economic loss actually occurred by virtue of the prearranged disposition of Golden State by Pacific Thrift, relying on *McWilliams v. Commissioner,* 331 U.S. 694 (1947), and *Merritt v. Commissioner, supra.*

Under California law a husband and wife each has a vested "present, existing and equal" interest in their community property although such property is managed by the husband. Cal.Civ.Code secs. 161a, 172, 172a (West 1954). Where both husband and wife have vested interests in community property which is sold, each is considered as a seller in determining whether the relationship designated under section 267(b) exists. *Daniel M. Ebberts,* 51 T.C. 49, 55 (1968); cf. *Arizona Publishing Co.,* 9 T.C. 85 (1947). Petitioners concede on brief that each of them individually owned, directly or indirectly, more than 50 percent in value of the outstanding stock of U.L.C. and that the requisite relationship existed between each of them and U.L.C. under section 267(b)(2) and the stipulated facts support this concession by petitioners. Respondent does not contend that there was a "direct" sale from petitioners to U.L.C., apparently recognizing the validity of the foreclosure sale at which Pacific Thrift purchased Golden State. Respondent's position is that there was a sale of the property "indirectly," between each of petitioners and U.L.C. within the meaning of section 267(a)(1).

The Supreme Court in *McWilliams v. Commissioner, supra,* thoroughly considered the scope of an indirect sale within the meaning of section 24(b)(1)(A), I.R.C. 1939, the predecessor of section 267(a)(1). In *McWilliams* the taxpayer-husband, who managed both his own and his taxpayer-wife's separate estate, ordered his broker to sell certain shares of stock for the account of one of them and to buy the same number of shares of the same stock for the other, at as nearly the same price as possible. The

orders were contemporaneously executed on the stock exchange. The selling spouse sold to someone other than the buying spouse and the buying spouse bought from someone other than the selling spouse. Each of the taxpayers filed a separate Federal income tax return and deducted the losses arising from the sales of their respective shares of stock. Although the Supreme Court realized that the losses arose from sales "between" persons other than those specified in the statute, it nonetheless held that the sales were indirect sales between persons designated by the statute and accordingly the resulting losses were disallowed.

The Supreme Court in *McWilliams* interpreted the underlying congressional purpose of section 24(b) of the 1939 Code, which contained provisions substantially the same as those of section 267(a)(1), to effectively determine the finality of an intragroup transfer of property and to absolutely prohibit the allowance of losses on any direct or indirect sales, bona fide or otherwise, between certain specified groups which have nearly the same economic interests unless there was such a break in the group's continuity of investment that it caused the seller to realize an economic loss. Consequently, if there is a shift of property between those economically related persons designated under section 267(b), then, regardless of the motive for and manner in which the intragroup transfer is accomplished, the resulting loss is disallowed under section 267(a)(1) unless there occurs a definite break in the continuity of the related group's economic interest in the transferred property so that the seller undoubtedly realizes a genuine substantive economic loss.

In *McWilliams,* where one spouse sold property and, through a prearrangement, the other spouse who was related to the seller under the statute contemporaneously purchased like property both in kind and amount and at nearly the same price, the Supreme Court concluded that, irrespective of the mechanics of the transaction, the spouses' economic interest as a whole in the transferred property had not for practical purposes been relinquished nor even diminished but retained uninterrupted and, in this economic sense, their sustained losses were not realized. Under these circumstances the Supreme Court held the sales of the shares of stock by the husband and wife were each an indirect sale between persons specified under the statute within the meaning of the forerunner of section 267(a)(1) and the resulting losses were disallowed pursuant thereto.

We note that in *McWilliams* the Supreme Court recognized a period of time between the sale of property by one party and the purchase of the same or like property by another party who is related to the former party under the statute may under some circumstances be sufficient to break the continuity of the related economic group's investment and to result in the realization of an economic loss by the selling party, thereby negating an indirect sale between the related parties and making the disallowance provision inapplicable. See also *United States v. Norton,* 250 F. 2d 902, 908-909 (C.A. 5, 1958).

The Supreme Court in *McWilliams v. Commissioner, supra* at 699-701, enunciated the following principles with respect to the forerunner of section 267(a)(1) which illuminate the circumstances in which a sale will be considered an "indirect" sale between persons related within the meaning of section 267(a)(1):

Section 24(b) states an *absolute* prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests [fn. omitted]. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in *economically genuine realizations of loss,* and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

\* \* \*

We conclude that the purpose of section 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers and other designated devices, their own time *for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.*

We are clear as to this purpose, too, that *its effectuation obviously had to be made independent of the manner in which an intra-group transfer was accomplished.* Congress, with such purpose in mind, could not have intended to include within the scope of section 24(b) only simple transfers made directly or through a dummy, or to exclude transfers of securities effected through the medium of the Stock Exchange, unless it wanted to leave a loop-hole almost as large as the one it had set out to close.

[Emphasis supplied.]

Each of petitioners sold Golden State and a related entity under section 267(b), U.L.C., purchased it. Whether this set of circumstances may constitute an "indirect" sale between each of petitioners and U.L.C. within the meaning of section 267(a)(1) depends on whether the purchase by U.L.C. was so related to the sale by each of petitioners of their interest in Golden State that

the economic interest of each of the specified groups, one consisting of E.E. and U.L.C. and the other of B.B. and U.L.C., continued for most practical purposes uninterrupted so that neither group's sustained loss was a realized loss in the economic sense. Under the facts here present there is not such a severance of the economic interest of either group in the property transferred as to result in the economic realization of the loss incurred by E.E. or B.B. and accordingly we conclude that the sale of each of petitioner's interest in Golden State to U.L.C. was an "indirect" sale between each of the designated groups within the meaning of section 267(a)(1) and the losses of E.E. and B.B. are disallowed thereunder.[5]

Under the facts of the instant case Golden State was purchased by Pacific Thrift on May 31, 1961, and, in accordance with its previous understanding with E.E., giving to him or an entity specified by him the right to purchase Golden State for an amount equal to the outstanding balance on the defaulted note and the foreclosure costs, Pacific Thrift entered into an escrow agreement with U.L.C. on June 5, 1961, on the same terms as those of the understanding and conveyed the property to U.L.C. on August 30, 1961. Even if we assume that Pacific Thrift, an independent legal entity, had absolute control over Golden State for a period of 5 days on the basis that the understanding between it and E.E. was unenforceable,[6] petitioners did not part with their economic interest in the property transferred so that they would realize an economic loss inasmuch as Pacific Thrift was willing at all times after the foreclosure sale to reconvey Golden State to E.E. or his designate and did in fact reconvey the property to U.L.C. pursuant to an escrow agreement entered into shortly

---

[5] There is nothing in this record to indicate why U.L.C. was the entity designated to purchase the property or that E.E. and B.B. could not personally have borrowed the funds to pay the note before the foreclosure sale or to either redeem or repurchase the property after that sale. The facts on this issue are fully stipulated and the only reference to E.E.'s efforts to borrow funds is that E.E. "who had been seeking financing to cure the default, was able to obtain several extensions."

[6] However on this record it may well be that the agreement was enforceable. Under California law an oral agreement for the sale of real property that is within the statute of frauds (Cal.Civ. Code sec. 1624 (West 1954)) is not void but voidable and may be taken out of the operation of the statute by a written memorandum executed subsequently, even though it fails to mention the precedent oral agreement. *Ayoob v. Ayoob,* 74 Cal. App. 2d 236, 168 P. 2d 462, 466-467 (3d Dist. Ct. App. 1946); *Potter v. Bland,* 136 Cal.App. 2d 125, 288 P. 2d 569, 573(1st Dist. Ct. App. 1955).

It also appears that E.E. and B.B. had the right to redeem Golden State under Cal. Civ. Pro. Code sec. 725a (West 1955). The record as to the foreclosure sale is certainly insufficient for us to conclude that they did not have such a right of redemption.

after the foreclosure sale, the terms of which were identical to those of the oral understanding. The sale by petitioners and the purchase by U.L.C., even if considered two independent transactions, were nonetheless so related to one another by virtue of the prearranged plan that petitioners did not realize an economic loss. At the time of the foreclosure sale petitioners did not anticipate that they would lose their economic interest in Golden State but rather contemplated by virtue of the prearranged understanding that they would retain their interest. Their reasonable expectations were subsequently fulfilled; consequently, their economic wealth was not reduced but merely relocated and their purported losses were not genuine losses in the economic sense but wholly illusory ones. *United States v. Norton, supra* at 907-908; *Robert Boehm,* 28 T.C. 407, 410-411 (1957), affirmed per curiam 255 F. 2d 684 (C.A. 2, 1958); *John B. Shethar,* 28 T.C. 1222, 1226 (1957). See *Merritt v. Commissioner,* 400 F.2d 417, 420-421 (C.A. 5, 1968), affirming 47 T.C. 519 (1967); *Daniel M. Ebberts, supra* at 55-56.

Petitioners' argument that there was not an "indirect" sale between each of them and U.L.C. relies principally on *McNeill v. Commissioner, supra,* and *McCarty v. Cripe, supra.* The Court of Appeals for the Fourth Circuit in the *McNeill* case stated that the taxpayer's land was seized by Pennsylvania tax authorities for nonpayment of taxes and after the taxpayer's right of redemption had expired and more than 6 years had elapsed the land was sold to the taxpayer's controlled corporation. The Fourth Circuit, reversing this Court, held on this basis that there was not an indirect sale between the taxpayer and his controlled corporation under the provisions of the predecessor of section 267(a)(1). However, under the facts in *McNeill* there was not any arrangement whereby the taxpayer or his controlled corporation could reasonably expect to retain the investment in the land. In that case there was lacking that nexus between the sale by the taxpayer and the purchase by his controlled corporation which exists in the instant case to show the existence of an indirect sale. In *McCarty,* the taxpayer's land was sold at public auction in satisfaction of tax and improvement liens to the highest of 25 bidders who paid for it with funds furnished him by the taxpayer and conveyed the land to the taxpayer's controlled corporation. The Court of Appeals for the Seventh Circuit held that there was not an indirect sale between the taxpayer and his controlled cor-

poration under the provision of the predecessor of section 267(a)(1). The sale by the taxpayer and the purchase by the corporation were not considered related as there was no indication that there was a prearrangement between the taxpayer and his corporation or anyone else which would have enabled the taxpayer to maintain his investment in the land and as there was a public sale with spirited bidding among a number of persons. These two cases are distinguishable from the instant case on their facts since in neither of those cases was there a prearrangement whereby the taxpayer was to retain his investment whereas in the instant case petitioners did have a prearrangement to retain their investment in Golden State. Here there was only one bidder at the trustee's sale of Golden State.

If the *McNeill* and *McCarty* cases are not interpreted to turn on the lack of any prearrangement whereby the taxpayer was to retain his interest, then they are clearly contrary to the holding of the Supreme Court in *McWilliams*. In that case the Supreme Court rejected the argument that two prearranged bona fide sales, the first to an unrelated party, resulted in no indirect sale "between" two related parties in construing language of the provisions of section 24(b) of the 1939 Code substantially the same as that of section 267(a)(1). The construction of section 267(a)(1) in accordance with petitioners' contention would read out of it any indirect sales, a result obviously contrary to the intent of Congress which enacted a statute making express reference to sales "directly" or "indirectly." Also, see our statement in *James H. Merritt, Sr.,* 47 T.C. 519, 528 (1967), affd. 400 F. 2d 417 (C.A. 5, 1968), that in our view the appeals courts in the *McNeill* and *McCarty* cases failed accurately to interpret the *McWilliams* case and the statement by the Fifth Circuit in *Merritt v. Commissioner, supra* at 420, that in its view the decision of the Fourth Circuit in the *McNeill* case was in error.

Petitioners urge that an indirect sale between each of them and U.L.C. did not occur as upon the initial sale to Pacific Thrift, there was not a binding commitment to make the subsequent sale to U.L.C., relying on *Commissioner v. Gordon, supra,* wherein the Supreme Court, in interpreting the divestiture of control requirements of section 355(a)(1)(D), stated that "Absent other specific directions from Congress, Code provisions must be interpreted so as to conform to the basic premise of annual tax accounting." Even if we assume petitioners properly labeled the commitment

of Pacific Thrift as "not binding," we do not understand how there has been any violation of this basic tenet of taxation under the facts of this case. Here the sale and the purchase by U.L.C. were in the same year. In any event, in our view, section 267(a)(1) does not necessitate that there be a determination of the allowance or nonallowance of a loss deduction based only on the situation at the close of a taxpayer's taxable year. To so hold would permit a sale by one related taxpayer such as was made in the *McWilliams* case a day or so before the close of a taxpayer's taxable year and a purchase by a related taxpayer a day or so after the beginning of that taxpayer's new taxable year, in effect permitting a loophole which would be a boon for the knowledgeable and a pitfall for the unwary. In *McWilliams,* the Supreme Court recognized that an indirect sale between specified parties within the meaning of the predecessor provision of section 267(a)(1) may occur although there is a lapse of a period of time between one party's sale and the other's purchase. The fact that the lapse of time extends beyond the close of the selling party's taxable year is of no consequence in determining whether there has been an indirect sale between designated parties.

Petitioners argue that the sale by each of them and the purchase by U.L.C. was not an indirect sale as there was no agreement at the time of the trustee's sale binding Pacific Thrift to transfer Golden State to U.L.C., relying on *American Bantam Car Co., supra.* In *American Bantam Car Co.,* we stated as follows at page 405:

> In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a variety of tests. Paul, Selected Studies in Federal Taxation, 2d series, pp. 200-254. Among the factors considered are the intent of the parties, the time element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?

Using these tests we held that the transfer of assets to a corporation controlled by the transferors and the previously contemplated subsequent sale of the corporation's preferred stock by the transferors were not interdependent steps of a single transaction, so that the transferors had control after the transfer under the provisions of the 1939 Code which are now contained in section 351(a), as the sale of the preferred stock was merely an

adjunct to the principal objective of the organization of a new corporation. In our view for an "indirect" sale to occur within the meaning of section 267(a)(1), it is not necessary that there be a single integrated transaction which transfers property between specified persons. To require that the several steps, which are taken with respect to the transfer of property between specified persons, must be considered as parts of a single integrated transaction for there to be an "indirect" sale would in effect limit the disallowance provisions of the statute only to "direct" sales. In *McWilliams* the Supreme Court held that there was an "indirect" sale even though the several steps involved were not considered as part of a single undivided transaction as the property sold by one party was not the identical property bought by the related party and the sale and purchase were not mutually dependent on one another.

The essentials of an "indirect" sale within the meaning of section 267(a)(1) are that the sale by one person and the purchase by another specified under the statute are so related to one another that the seller does not realize a genuine economic loss. In determining whether there is in fact such an economic loss, the intent of the parties, the time element, the ultimate result, and the mutual interdependence of the steps taken as well as the selling price, the fair market value, and the near-identity of terms of the sale and purchase are among the factors to be considered. However, it is not essential that the sale and purchase be considered a single transaction for there to be an "indirect" sale within the meaning of section 267(a)(1).

Finally, we note that while a taxpayer can dispose of his property whenever he so desires, thus controlling the time of his gain or loss on the sale, such a capacity or lack thereof is not material in the determination of whether section 267(a)(1) is applicable. *James H. Merritt, Sr., supra* at 528; *Thomas Zacek,* 8 T.C. 1056, 1057 (1947).

We hold that respondent properly disallowed the loss claimed by E.E. and B.B. on the foreclosure sale of Golden State.

## Issue 2

This issue is purely factual. It is stipulated that Vinemore keeps its books and reports its income on an accrual basis of accounting. The evidence shows that Vinemore was in fact the operator of C.C. even though 1925 Corp. performed the functions

of the hospital operation on its behalf. On the basis of these facts, it is clear that under section 162(a)(3) allowing an accrual basis taxpayer a deduction for rentals or other payments it is obligated to make as a condition to its continued use or possession of property for the purposes of its trade or business, Vinemore is entitled to deduct the $4,000 a month rental of the C.C. hospital unless it has been allowed this deduction under another category in the computation of its taxable income or it was not the entity liable for the payment of this rent.

Petitioners take the position that Vinemore has met its burden of proof of showing that it did not deduct on its tax return the rental paid to C.C. and that it was liable for the entire $48,000 of rental due from C.C. under the lease.

Respondent takes the position that the evidence is insufficient to show that Vinemore was liable for the payment of rent for C.C. and if it were so liable, that it had not been allowed the rental deduction in the computation of its taxable income in the deficiency notice.

The record is clear that the only amount which Vinemore deducted as rent on its tax return for its fiscal year ended August 31, 1964, was the $52,330 which respondent in his notice of deficiency referred to as the rental for Golden State. Vinemore concedes that it is not entitled to the disallowed portion of this claimed deduction for rental of Golden State. However, even though respondent considered the $52,330 of rent claimed as a deduction by Vinemore to be for rent of Golden State, the evidence is not clear that this claimed deduction for rent was actually for rental of Golden State. There is nothing in the record to indicate that Vinemore had any connection with Golden State, and the indication from the record is that it did not. U.L.C. owned Golden State and the indication in the record is that U.L.C. was the operator of Golden State. While the record shows that the initial $12,000 paid for the first 3 months' rent of C.C. was on a check drawn on U.L.C.'s bank account by E.E., the evidence in the record, though not completely clear, is sufficient to show that this was either an advance or a contribution to Vinemore by either U.L.C. or E.E. The record also shows that C.C. on its books of account had entries showing accounts payable to U.L.C. and that the administrator of C.C. considered the C.C. income and bank account to belong to Vinemore and the obligations of C.C. to be those of Vinemore since Vinemore was

the operator of C.C. That his assumption that Vinemore was responsible for C.C.'s obligations and was the owner of C.C.'s income was correct, is borne out by the fact that respondent in his notice of deficiency considered C.C.'s income to be that of Vinemore and allowed Vinemore deductions for the operating expenses of C.C. Although salaries for the operation of C.C. were reported in the same manner on Vinemore's return as was the $52,330 of rental, respondent allowed the salaries deduction but disallowed the rental deduction except to the extent he considered it paid partially on the basis that it was rental due to U.L.C., a related taxpayer.

Under these facts we do not consider it sufficiently clear that the $52,330 which Vinemore deducted not to be rental of the C.C. hospital to sustain petitioners' contention that Vinemore did not deduct any rental for the C.C. hospital on its return. However, all but $12,333.35 of this claimed rental deduction by Vinemore was disallowed by respondent, one reason for the disallowance being respondent's conclusion that this deduction was for unpaid rental due by Vinemore to U.L.C. It may well be that the moneys that paid the C.C. rental came to Vinemore as loans from U.L.C. and that in the U.L.C. account on the books of C.C., the advances by U.L.C. for payment of rent on the C.C. premises were shown as an amount due U.L.C. for rent. The record is not clear enough on this point to reach a conclusion.

However, it is clear that Vinemore was not obligated for and did not pay any rental on Golden State and that it was obligated for the $4,000 a month rental of the C.C. hospital. Even though a separate set of books was kept for C.C., those books showed the income and obligations of Vinemore. Even if the books of C.C. were sufficiently confusing as to indicate that rental was due by Vinemore to U.L.C., the record establishes this not to be a fact. The $4,000 a month rental of C.C. was due to Trinity, an entity totally unrelated to either Vinemore or U.L.C.

On the basis of the facts in this record we conclude that it is proper for Vinemore to accrue and deduct $48,000 of rental expense for rental of C.C. during its fiscal year ended August 31, 1964, but that the record is insufficient to show that the $12,333.35 which respondent allowed to Vinemore as a rental deduction is not in fact part of the $48,000 of accrued rent of the C.C. premises. We therefore conclude on the basis of this record

that Vinemore is entitled to an additional deduction of $35,666.65 as rental expense.

*Decisions will be entered under Rule 155.*