Colletta Lake RAY et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 72-H-1475.

United States District Court, S. D. Texas, Houston Division.

Nov. 6, 1974.

Marvin K. Collie, Carl Estes, II, & Donald F. Wood, Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., Larry Jones, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

In this action for refund of estate taxes paid by the Estate of Robert H. Ray, the defendant has counterclaimed, alleging that the estate was erroneously permitted to redeem certain Treasury Bonds at face value in payment of the estate taxes. The action is brought by Jack C. Pollard, Collette Lake Ray and Taylor Ray, the duly qualified and acting Independent Executors of the estate, and was heard by the Court without a jury. Jurisdiction vests in this Court by virtue of 28 U.S.C. § 1346(a)(1).

The facts relevant to this controversy indicate that on September 26, 1967, the decedent was found to be terminally ill, a victim of multiple myeloma or bone cancer. On the advice of decedent's attorney and with the consent of decedent's wife, Pollard, decedent's business partner, borrowed, as agent for decedent, $1,000,000 from the First City National Bank and signed a promissory note for that amount on December 26, 1967. The note, which was due in six months and bore interest at the rate of 6½ percent, contained the following language:

> Bank acknowledges that the proceeds of the loan evidenced by this note are and shall be the separate property of Robert H. Ray and hereby agrees that this indebtedness shall be paid out of his separate funds and that only his separate property (including the Government bonds purchased with proceeds of this loan) shall be liable for the payment of this indebtedness.

> Payment of this note is secured by a security agreement dtd 12-26-67 covering $1,270,000.00 U. S. Treas, 3½% Bds due 2-15-90.

Using the proceeds of this loan, Pollard purchased on the same date $1,270,000 par value 3½ percent United States Treasury Bonds due February 15, 1990, and signed a security agreement pledging the Treasury Bonds as security

for the loan. This agreement contained the following stipulation:

> The term "Liabilities" shall mean the indebtedness evidenced by note of even date herewith in the principal amount of $1,000,000.00 executed by Jack C. Pollard as Agent and Attorney in Fact for Robert H. Ray, payable to the order of Bank on or before six months.

> Notwithstanding anything herein to the contrary, Bank agrees that the Liabilities shall be paid out of the separate funds of Robert H. Ray and that only his separate property (including the Collateral) shall be liable for payment of the Liabilities.

At the time of the loan and subsequent purchase of the bonds, the decedent owned only a negligible amount of separate property, the vast majority of his assets consisting of community property. Decedent died on January 5, 1968, a resident of the State of Texas.

Plaintiffs timely filed Form 706, United States Estate Tax Return, on behalf of the estate with the District Director of Internal Revenue. The return reported the United States Treasury Bonds as the separate property of decedent and the note executed for the loan to purchase the bonds as a separate debt of the decedent. Accordingly, a marital deduction based upon the bonds being the decedent's separate property was claimed. By virtue of 26 U.S.C. § 6312(a) (since repealed, with respect to bonds issued after March 3, 1971, by Pub.L. No. 92–5 § 4(a), 85 Stat. 5),[1] a substantial portion of these bonds were then accepted by the Internal Revenue Service at their face value in payment of the estate taxes due as shown on the estate's tax return.

Subsequently, the Commissioner determined the bonds to be community rather than separate property and included only one-half of the bonds in the estate, thereby reducing the separate debt by one-half and disallowing the marital deduction. Additional taxes were assessed against the estate as the result of this determination. These were paid in part by the redemption of the remaining Treasury Bonds, which were redeemed by the Service at their face value.

Plaintiffs timely filed a claim for refund premised principally upon the Commissioner's characterization of the bonds as community property. Upon the disallowance of this claim, plaintiffs subsequently instituted this action. The complaint, supplemental complaint and counterclaim thus present for determination several issues:

(1) whether the bonds purchased on December 26, 1967, constitute the separate property of the decedent;

(2) whether the characterization of the bonds by the estate as separate property lacks economic substance and must be therefore disregarded;

(3) whether the estate is entitled to a marital deduction;

(4) whether the estate is entitled to deduct certain administrative expenses in full or whether these may be attributed in part to the community and deducted only in part.

The Government's counterclaim is premised upon the fact that the Internal Revenue Service redeemed at their face value in payment of the estate tax the totality of the bonds purchased on December 26, 1967. By virtue of the Commissioner's determination that only 50 percent of these bonds were includable in the decedent's estate, the Government argues that the other one-half of these bonds were erroneously redeemed at face value and should be reissued to the dece-

---

1. That statute read, in pertinent part:
"It shall be lawful for the Secretary or his delegate to receive, at par with an adjustment for accrued interest, Treasury bills, notes and certificates of indebtedness issued by the United States in payment of any internal revenue taxes . . . ."

dent's spouse. Additional payment would then be due to replace the reissued bonds.

## THE U. S. TREASURY BONDS AS THE SEPARATE OR COMMUNITY PROPERTY OF THE DECEDENT

The separate property of a spouse is characterized in Texas by Article 5.01 of the Texas Family Code, V. T.C.A., as:

(1) the property owned or claimed by the spouse before marriage;

(2) the property acquired by the spouse during marriage by gift, devise or descent; and

(3) the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage.

Community property is thus defined as all "property, other than separate property, acquired by either spouse during marriage". Under Texas law, the separate or community nature of property has been determined by courts at the time of acquisition under the inception of title rule. *See, e. g.*, Lindsay v. Clayman, 151 Tex. 593, 254 S.W.2d 777, 780 (1952). In transactions not involving credit or the indicia of a gift, courts have applied a tracing principle and characterized the subject property as separate or community or a combination thereof depending upon the nature of the funds or property actually used at the time of purchase to acquire it. *See, e. g.*, Freedman v. United States, 382 F. 2d 742 (5th Cir. 1967); Duncan v. United States, 247 F.2d 845 (5th Cir. 1957); Gleich v. Bongio, 128 Tex. 606, 99 S.W.2d 881, 883 (1937); Baize v. Baize, 460 S.W.2d 255 (Tex.Civ.App.—Eastland 1970, no writ). However, Tex-

as courts have not uniformly traced the source of funds used in acquiring property during a marriage. Where the deed or purchase agreement contains a recitation that the property acquired is the separate property of one spouse and the other spouse has acquiesced in the transaction, the nature of the funds actually used to acquire the property has been viewed as irrelevant; the property is considered to be a gift. *See, e. g.*, Paudler v. Paudler, 210 F.2d 765 (5th Cir. 1954); Messer v. Johnson, 422 S. W.2d 908 (Tex.1968); Lindsay v. Clayman, *supra*; McKivett v. McKivett, 123 Tex. 298, 70 S.W.2d 694 (Tex.1934). Likewise, Texas courts have recognized that when one spouse acquires property on credit with the creditor agreeing to look solely to the separate property of that spouse for compensation in the event of default, the spouse serving as the source of credit is considered the owner.[2] *See* Broussard v. Tian, 156 Tex. 371, 295 S.W.2d 405 (1956); Gleich v. Bongio, *supra*; Dorfman v. Dorfman, 457 S.W.2d 91, 95 (Tex.Civ.App.—Waco 1970, no writ); Harrington v. Harrington, 451 S.W.2d 797, 799 (Tex.Civ.App.—Houston [1st Div.] 1967, writ dism'd); Dillard v. Dillard, 341 S.W.2d 668, 671 (Tex. Civ.App.—Ft. Worth 1960, writ ref. n. r. e.); Carter v. Grabeel, 341 S.W.2d 458, 460 (Tex.Civ.App.—Amarillo 1960, no writ); Goodloe v. Williams, 302 S.W.2d 235, 237 (Tex.Civ.App.—Texarkana 1957, writ ref.). *See generally* Huie, W., Commentary—Community Property Law, 13 Vernon's Annotated Revised Civil Statutes § 6 (1960).

Thus, by virtue of the inception of title rule in instances where property is purchased on credit, Texas courts have indicated that it is irrelevant if community funds were actually used to repay the separate debt.[3] *See*

---

2. It appears that the prior rule followed by Texas courts did not permit a married woman to obtain separate property by virtue of a credit transaction. *See* Farmers' State Bank v. Farmer, 157 S.W. 283 (Tex.Civ. App.—Amarillo 1913); Harrison v. Mansur-Tibbetts Implement Co., 16 Tex.Civ.App. 630, 41 S.W. 842 (1897); Schuster v. Bau-

man Jewelry Co., 79 Tex. 179, 15 S.W. 259 (Tex.1890). The Court does not find that this rule of law continues to be viable at the present time.

3. In the absence of an explicit agreement between the debtor and the creditor to look only to the separate estate of one spouse

Broussard v. Tian, *supra*; Lindsay v. Clayman, *supra*; Smith v. Buss, 135 Tex. 566, 144 S.W. 529 (1940); Orr v. Pope, 400 S.W.2d 614 (Tex.Civ.App.— Amarillo 1960, writ. ref. n. r. e.). Although the other spouse or the community may be entitled to reimbursement for the funds expended in repayment of the separate debt, title to the property still vests in the purchasing spouse. *See* Broussard v. Tian, *supra*; Beeler v. Beeler, 363 S.W.2d 305 (Tex.Civ.App.— Beaumont 1962, writ dism'd). Furthermore, courts have indicated that it is irrelevant under Texas law if the community or separate estate incurring the obligation has sufficient funds to repay its debt. *See* Gleich v. Bongio, *supra*.

 Under a strict application of the above principles, the bonds in this instance should be treated as separate property. Decisions of the Texas courts have emphasized that the agreement between the creditor and the borrower is the primary indication of whether a debt is separate or community. It is evident from the loan agreement that the First City National Bank intended to look only to the decedent's separate estate for repayment. Thus, by virtue of this agreement the borrowed funds became the decedent's separate property, and the property purchased with these funds, the Treasury Bonds, is property acquired by separate property.

The Government has advanced several arguments to defeat application of this principle. First, the Government argues that the application of this rule of law is contrary to the Texas Constitution [4] as well as to the decision of the Texas Supreme Court in Hilley v. Hilley, 161 Tex. 569, 342 S.W.2d 565 (1961).

> All marital property is thus either separate or community. If acquired before marriage by any method, or after marriage by gift, devise or descent, it is separate; otherwise it is community. There are only two exceptions. Property purchased with separate funds is separate [citation omitted] and community property partitioned in the manner provided in Articles 4624a and 881a–23, becomes separate property. . . . [W]hile the husband may make a direct gift of his separate property or the community estate to his wife, the spouses cannot by a mere agreement change the character and nature of the rights and interest in property owned or acquired by them from that prescribed by law.

*Id.* at 567–568. Because this property was acquired after marriage, did not pass by devise or descent and was not acquired with separate funds, the Government argues that treating it as separate property is contrary to the definition of separate property as set forth by Texas law. Furthermore, the Government buttresses its argument by alleging that an agreement between the spouse and the vendor is irrelevant in determining the community or separate nature of property, absent a valid partition.

---

for satisfaction of the indebtedness, property purchased on credit has been considered separate if it can be shown that the creditor expected payment from one spouse and that payment was actually made out of the separate estate. *See* Edsall v. Edsall, 240 S.W. 2d 424 (Tex.Civ.App.—Eastland 1951, no writ).

4. All property, both real and personal, of the wife, owned or claimed by her before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of the wife; and laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate

property as that held in common with her husband; provided that husband and wife, without prejudice to pre-existing creditors, may from time to time by written instrument as if the wife were a feme sole partition between themselves in severalty or into equal undivided interests all or any part of their existing community property, or exchange between themselves the community interest of one spouse in any property for the community interest of the other spouse in other community property, whereupon the portion or interest set aside to each spouse shall be and constitute a part of the separate property of such spouse. Tex.Const. art. XVI, § 15, Vernon's Ann.St.

The Court does not find that treating these Treasury Bonds as separate property is inconsistent with either the decision in *Hilley* or the Texas Constitution. Neither authority considers the manner in which a court must determine the ownership of property acquired by virtue of a credit transaction. In credit cases, application of the tracing principle becomes much more complex. Indeed, title to the property could not be established until after the debt was paid if the tracing principle were strictly utilized. Such an approach is contrary to any application of the inception of title rule. Accordingly, the rule of Gleich v. Bongio supports application of this latter principle by requiring that property purchased on credit be determined at the time of acquisition by looking to the type of property that will be subjected to forfeiture in the event of a default.

Second, the Government claims that property purchased on credit should receive its community or separate characterization by virtue of the source of the funds from which the purchasing spouse expects to repay the loan. In applying such a rule in this case, the Government argues that the bonds must be considered community property, since the decedent had no separate property with which to repay the loan. In making this argument, the Government relies upon the case of Edsall v. Edsall, 240 S.W.2d 424 (Tex.Civ.App.—Eastland 1951, no writ), in which property purchased on credit was held to be separate because it was clearly evident that the purchaser intended to repay the short-term loan with separate property. However, the Court does not find that *Edsall* controls the result in this case. In *Edsall*, there was no agreement between the vendor and the purchaser to look only to the separate property of the purchaser for repayment of the purchase money debt. The legal principle recognized in *Gleich* actually was not before the court in *Edsall*. In the present suit there is a very explicit recitation in the promissory note executed by Pollard as well as in the agreement executed by the bank that it would look only to the separate property of the decedent including the Government bonds purchased with the proceeds of the loan for payment of the indebtedness. In view of the distinguishable factual circumstances, the Court cannot view *Edsall* as limiting the application of *Gleich* to the present case. In addition, the source of the repayment of the debt incurred has no materiality insofar as the separate or community character of the Government bonds is concerned, since any possible repayment of the indebtedness by the non-purchasing spouse from separate or community property would be equalized under the law by the right to reimbursement. *E. g.*, Broussard v. Tian, *supra*.

Third, the Government argues that it was necessary for the decedent to have made an initial down payment from his separate property before he could purchase property on his separate credit. Indeed, this crucial controversy between the parties arises because, contrary to the varying circumstances existing in the reported cases, the entire transaction in this instance was effected with borrowed funds, there being no initial down payment of separate property in any amount to establish the debt as separate in character under the inception in title rule. The Government's argument finds support in cases such as Schuster v. Bauman Jewelry Co., 79 Tex. 179, 15 S. W. 259 (Tex.1890), in which the court declared that "[t]he wife's equity in such cases arises from the actual investment of her separate property". *Id.* at 260. Because the wife had not made a down payment with separate funds on property purchased partially on her separate credit and partially on the credit of the community, the court in that case held the property to be entirely community. This Court does not find this rationale to be supported by the more modern case law or the underlying concept of the separate credit principle. Where property is purchased partially with cash and partially with credit, courts have determined ownership proportionately by tracing the source of the

cash payment and the source of the credit at the time of purchase. *See* Gleich v. Bongio, *supra*. However, when the separate cash down payment is absent and the entire transaction turns on the extension of credit, it would be economically unrealistic to apply any rule other than that applicable to the credit portion of transactions involving cash down payments. The Court can determine no valid reason for permitting a portion of property to be purchased on the separate credit of one spouse while not permitting that same spouse to obtain the entire property on his separate credit. In such instance the rule should be the same—property will take on the character of the consideration used to purchase it, whether that consideration be cash or credit.

Although the principle of permitting a spouse to independently acquire separate property through the use of separate credit has been vigorously challenged as lacking a strong conceptual basis in Texas property law, *see* Fritz, Marital Property—Effects of Recitals and Credit Purchase, 41 Tex.L.R. 1 (1962), the principle appears to be well recognized and one which this Court would be reluctant to set aside in the absence of a more definitive expression from the Supreme Court of Texas. It seems that the rule set forth in Gleich v. Bongio is a judicial response to the practical problems inherent in determining the character of property purchased on credit. Unlike cash transactions, it does not appear nearly as feasible to "trace" the source of funds actually used to repay the loan in a credit transaction. Reliance upon such an approach in the present case would entail a delay in determining the separate or community character of property financed entirely through a loan which would normally be repaid over a considerable period of time. Similarly, strict application of the "tracing principle" to property purchased on credit would serve to circumvent the inception of title rule, since title actually would not be established until after the debt incurred in acquiring the property had been repaid.

It is conceded by both parties that the legal issues involved in this case raise unique questions as to the interpretation of Texas community property law. No resolution by this Court can reconcile existing conceptual inconsistencies found in the cases.[5] By applying the rule set forth in *Gleich*, the result is that all parties are cognizant at the time that property is acquired of whether it will be separate or community property. Although this same degree of certainty could be achieved by merely presuming that any property purchased on credit during the existence of a marriage is community, it appears to be more equitable to permit one spouse to encumber his own separate estate for the benefit of that estate so long as it does not jeopardize the community property of the other spouse. In that connection it is only too apparent from the record that what was community property before the Government bonds were purchased continued to be community property after such purchase. On the basis of the evidence presented and a consideration of the applicable Texas law, the Court can only conclude that the bonds purchased by the decedent on December 27, 1967, constituted his separate estate and should be treated accordingly for tax purposes.

## PURCHASE OF THE BONDS AS TAX AVOIDANCE

The Government argues that even if the property in question can be consid-

---

5. Actually Professor Fritz strongly urges abandonment of the inception of title rule when he states:

"It seems much more consistent with the general pattern of Texas marital property law to discountenance the inception-of-title rule altogether or to confine it to transactions initiated before marriage, and to recognize that the tracing of separate funds establishes separate ownership in a credit purchase, as it does in a cash purchase." Recognizing the sharp cleavage in conceptual thinking over the thrust of Gleich v. Bongio, it is not for this Court to ignore its application in a case which on the relevant facts is uniquely within its ambit.

ered the separate property of the decedent, under Texas law, this Court should treat the bonds as the property of the community because the designation as separate property is solely for the purpose of tax avoidance and lacks economic substance. This argument is premised upon its assertion that the intent of the parties was to repay the loans with community funds. It should be noted that the Government does not challenge the validity of the purchase of the bonds for tax avoidance purposes; rather, its argument is limited to their designation as separate, rather than community property.

 "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). However, courts will look beyond the form of the transaction to consider its substance in determining if a taxpayer has properly characterized a particular transaction in minimizing his taxes. E. g., Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 657–658 (5th Cir. 1968).

> The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases, the transaction as a whole is different from its appearance. . . . [T]he purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize.

Chisholm v. Comm., 79 F.2d 14, 15 (2d Cir. 1935) (Hand, J.)

Admittedly, the line between legitimate tax minimization and illegitimate tax avoidance is not always easily discerned. However, the Court finds that the Government's argument is unpersuasive in this instance. Under Texas law, the key to determining the character of the funds where property is purchased by a spouse on credit is the agreement between the creditor and the borrower as to which property will be looked to for repayment. From the evidence forthcoming at the trial, this Court does not find that the intent of the parties to the transaction in question was to diminish the wife's community estate by repayment of a loan fraudulently designated as a separate debt. The community estate was never jeopardized, since the bank that made the loan with which the bonds were purchased agreed in writing to look only to the separate property of the decedent for payment. There is no evidence of any contrary agreement. Indeed, the bank loan itself provided the means to obtain the collateral, that is, the Treasury bonds, which was to secure the loan and repay it in the event of default. The fact that the decedent lacked a significant amount of separate property before the loan transaction is no evidence under these facts of his intention to have the loan repaid through the use of community funds. While the bank loan was conceded to be out of the ordinary and theoretically could be criticized as being, in actuality, unsecured for the benefit of a preferred bank customer, the key factor is not the reason why the bank chose to favor decedent; instead, it is, as indicated above, the agreed upon source of funds which the parties intended would be used to repay the loan. This Court cannot find that the transaction created any risk of injustice to the wife or did violence to the community in any way, nor can it find that the agreement was other than what it appeared to be. Of course, the bonds were not used directly to repay the loan, since the decedent died before the loan became due at the bank. Instead, the bonds were utilized pursuant to a then valid tax statute, since repealed, to pay estate taxes. The loan was ultimately repaid in installments from the decedent's estate following termination of the community at his death.

## THE MARITAL DEDUCTION

The Government argues that the plaintiffs are not entitled to a marital deduction because the property in question, the Treasury bonds, is community property that has been converted into separate property. This argument is premised upon 26 U.S.C. § 2056(c)(2)(C), which reads in pertinent part:

> If . . . property held as such community property . . . was by the decedent and the surviving spouse converted, by one transaction or a series of transactions, into separate property of the decedent and his spouse . . . the separate property so acquired by the decedent and any property acquired at any time by the decedent in exchange therefor . . . shall . . . be considered as 'held as such community property'.

From a consideration of the facts of this case, the Court finds this argument to be unpersuasive. The community estate was in no way diminished by the loan transaction which culminated in the purchase of the bonds in view of the fact that the bonds themselves provided their own source of revenue to repay the debt. Because the bonds, as well as the funds used to purchase the bonds, were never held as community property, § 2056(c)(2)(C) is inapplicable, and the estate is entitled to a marital deduction.

## THE DEDUCTIONS FOR ADMINISTRATIVE EXPENSES

Plaintiffs challenge the disallowance by the Commissioner of certain administrative expenses in the following amounts:

| | |
|---|---|
| Appraiser's fees | $24,987.50 |
| Brokerage fees involved in the sale of decedent's one-half of the community securities | $11,382.23 |
| Attorney's fees | $28,238.95 |

Plaintiffs argue that those administrative expenses attributable solely to decedent's one-half of the community property as well as to his separate property are deductible in full. By way of opposition, the Government asserts that because the entire community is liable for the necessary and reasonable expenses of administration of the community during probate, the estate should be entitled to deduct only one-half of these expenses, as that amount constitutes the portion of the expenses for which the estate is actually liable.

Deductions for administrative expenses are allowable by virtue of section 2053 of Title 26:

> For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—
>
> . . . . . .
>
> (2) for administration expenses,
>
> . . . . . .
>
> as are allowable by the laws of the jurisdiction . . . under which the estate is being administered.

Accordingly, no deduction is allowed for the administrative expenses that are chargeable by state law to the community property of the surviving spouse. See United States v. Stapf, 375 U.S. 118, 134, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963).

Several decisions by Texas courts have recognized that the entire community estate is liable for the expenses incurred in a temporary administration of community property belonging to the decedent and surviving spouse. See Goggans v. Simmons, 319 S.W.2d 442, 446 (Tex.Civ.App.—Ft. Worth 1958, writ ref. n. r. e.); Norwood v. Farmers & Merchants Nat'l Bank, 145 S.W.2d 1100 (Tex.Civ.App.—Eastland 1940, writ ref.); Moore v. Wooten, 280 S.W. 742 (Tex.Comm'n App.1926). However, not all administrative expenses of an estate administered in a community property jurisdiction are only partially deductible. In Rev.Rul. 66–21, 1966–1 C.B. 219, the Commissioner recognized that expenses which can be specifically allocated to the decedent's share of the community property, such as attor-

ney's fees incurred in the determination or litigation of estate and inheritance taxes in connection with his share of the property, are fully deductible. Expenses incurred solely in determining estate tax liability are allowable in full to the decedent's estate. The deduction for all other ordinary expenses in any way connected with the management or division of the community should be limited to fifty percent of the expenses.

The ruling is based in part upon the Ninth Circuit decision in Lang's Estate v. Comm., 97 F.2d 867 (9th Cir. 1938). Applying the community property law of Washington, which charged the entire community with responsibility for administrative expenses incurred in the administration of all community property, the court held that particular items of attorneys fees incurred in determining estate tax liability were deductible in full.

It is immaterial that the expense was incurred in the course of the administration of the entire community estate. They were incurred solely for and on behalf of that portion of the community estate which was subject to decedent's disposition and which made up the "estate" subject to tax by the state and federal governments. The portion of the community automatically distributed to the decedent's wife, and which is no part of the gross estate under the Revenue Act, was unconcerned with such tax liability and derived no benefit from the services rendered and expenses incurred.

*Id.* at 812. Against this background, it is necessary to consider each of the claimed administrative expenses individually to determine the purpose of its expenditure.

■ Based upon the foregoing authority, the estate should have been permitted to deduct the appraiser's fees necessary to determine the value of estate property. Testimony of the estate's attorney and accountant, as well as that of Jack Pollard, an executor, indicated that the appraisals were made solely for the purpose of determining a basis for the property for tax purposes, even though the expenses themselves were incurred during the joint administration of the community property. Without the necessity of filing an estate tax return, no appraisal of the estate's property would have been made. Such an expense is clearly one "incurred solely in determining estate tax liability". The Government argues that the decedent's spouse benefited by virtue of this appraisal in that she received the stepped-up basis on the property involved. However, the new basis of the property did not result from the appraisal, but by operation of law. *See* 26 U.S.C. § 1014. Accordingly, the estate is entitled to deduct the entire amount attributable to appraising the estate property for tax purposes.

■ With regard to the claimed deduction for attorney's fees, testimony of the estate's attorney indicated that 75 percent of the attorney's fees were incurred in determining the estate and income taxes of the estate. Approximately 5 percent related directly to the portion of the community allocable to the surviving spouse, and the remainder pertained to administration of the decedent's portion of the community, including probating the will and other minor legal affairs pertaining to the estate itself. By virtue of Rev.Rul. 66–21, it is apparent that 75 percent of the attorney's fees are deductible in full, as they are specifically attributable to determining the estate's tax liability. Likewise, it is readily apparent that 5 percent of these fees are not so deductible because they can be attributed to the property of the surviving spouse. As for the remaining 20 percent, the Court finds that such legal fees are not a community debt in that they were not incurred in the management or division of the community, but in the routine probating of the estate. Accordingly, 95 percent of these attorney's fees are deductible in full.

With regard to the estate's claimed deduction of brokerage fees for the sale of the decedent's share of the Ampex stock, there is no question but that the stock sold was that of the decedent, as opposed to the portion of the stock belonging to Mrs. Ray. The Court therefore finds that this is an expense "which can be specifically allocated to the decedent's share of the community property". There is no indication that this was an expense connected in any way with the joint administration of the community. Thus, deduction for the brokerage fees should have been allowed in full pursuant to Rev.Rul. 66–21.

Counsel for plaintiff will submit within thirty (30) days an appropriate judgment in accordance with the foregoing Memorandum and Opinion.