COURTNEY L. SIEWERT, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 169–77.    Filed May 14, 1979.

---

*Clarence P. Brazill, Jr.,* and *John A. Freels,* for the petitioner.
*Deborah A. Butler,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $2,976.28 in petitioner's Federal income tax for 1972. Petitioner concedes the adjustments determined by respondent in the notice of deficiency. He claims, however, a refund in the amount of $21,288.07 for 1972, raising for decision the following issues:

(1) Whether the division of property between petitioner Courtney L. Siewert and Helen Siewert, husband and wife, under a property settlement agreement approved in a divorce decree entered May 2, 1972, was a nontaxable partition of community property or a taxable purchase and sale transaction.

(2) If the division was a taxable purchase and sale transaction, whether gain realized by petitioner Courtney L. Siewert on subsequent sales in 1972 of certain property received pursuant to the divorce decree is nonrecognizable under the provisions of section 267(d).[1]

### FINDINGS OF FACT

Petitioner Courtney L. Siewert (hereinafter petitioner) was a legal resident of Lubbock, Tex., when he filed his petition. For 1972, petitioner filed a Federal income tax return and an amended income tax return with the Internal Revenue Service, Southwest Regional Service Center, Austin, Tex.

On May 2, 1972, after extensive negotiations, petitioner and Helen Siewert, his wife (hereinafter Helen), entered into a property settlement agreement (the agreement) in which they divided their community estate and provided for certain payments to be made by petitioner to Helen. The agreement was contingent on obtaining a divorce and receiving court approval thereof. The 137th District Court of Lubbock County, Tex. (the

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

divorce court), in granting petitioner and Helen a divorce on that same day, approved the agreement as "a fair, equitable and just property settlement and division." In pertinent part, the agreement reads as follows:

1. These parties own certain art works and they have entered into an agreement concerning a division in kind of these items. * * *

2. HELEN SIEWERT shall receive as her separate property and estate, free and clear of any claims by C. L. SIEWERT, the following, to-wit:

(a) The residence * * *

(b) A Cadillac automobile * * *

(c) $200,000.00, of which $100,000.00 shall be paid in cash at the date of consummating this agreement and the balance which shall be paid in three (3) equal annual installments on the principal each in the sum of $33,333.33, * * * [beginning] on or before one year from the date of the entry of the judgment herein contemplated, * * * and upon each installment paying date, all accrued interest at the rate of 4% per annum, upon all unpaid principal, shall be paid.

(d) A life annuity policy * * *

(e) 1/2 of the refund by reason of any over payment of income tax for 1971 for C. L. SIEWERT and HELEN SIEWERT. * * *

3. C. L. SIEWERT agrees to pay the first $10,600.00 of attorneys fees charged by CRENSHAW-DUPREE and MILAM for their services in this divorce matter and in rendering tax counsel and advice.

4. C. L. SIEWERT shall receive, and there shall be set apart to him as his separate property and estate, free and clear of any claims by HELEN SIEWERT, all of the other community property in which either of these parties own an interest, * * · *

5. C. L. SIEWERT agrees to pay and hold HELEN SIEWERT harmless from all community indebtedness as of May 1, 1972 (other than federal income tax liability) * * *

6. It is acknowledged that as a part of the consideration for C. L. SIEWERT acquiring the approximate 21,911 acres of ranch land and permanent improvements known generally as the S Lazy S in Motley and Dickens Counties, Texas the said C. L. SIEWERT agrees that in the event of a sale of this ranch to any purchaser other than C. L. SIEWERT & SONS, INC., and/or the three children or any combination of the three children of the parties to this agreement, then in such event there shall be paid to C. L. SIEWERT & SONS, INC. for its interest in such ranch the sum of $527,346.39 of the sale price less so much of the present debts (not exceeding $28,888.11) as have thereto been paid out of the income from the operations of said ranch or from payments made by C. L. SIEWERT. This means that a minimum of $498,458.28 and a maximum of $527,346.39 paid out of such purchase price, or C. L. SIEWERT & SONS, INC. may take its pro-rata share of such purchase price if it is a greater sum.

\*     \*     \*     \*     \*     \*     \*

8. C. L. SIEWERT agrees to pay for a four (4) year college education for Clark Courtney Siewert, Charles Peter Siewert and Allan Edward Siewert [petitioner's and Helen's sons] after each graduates from high school and in the

event and to the extent that each such child desires to take such college education.

Following is a schedule (the property schedule) which details the community property and liabilities as of May 2, 1972, shows the values thereof used for negotiation purposes, and reflects the party who received the property and assumed the liabilities:

| Listed property as per property settlement agreement and divorce decree | Values used for negotiations as of May 2, 1972 | Petitioner | Helen |
|---|---|---|---|
| Cash in banks | $16,920.85 | $16,920.85 | 0 |
| Savings accounts and CD's | 487,462.77 | 486,414.12 | $1,048.65 |
| Deposit Federal income tax | 50,060.00 | 28,000.00 | 22,060.00 |
| Automobile | 4,250.00 | 0 | 4,250.00 |
| Residence | 72,188.39 | 0 | 72,188.39 |
| Paintings and art | 35,105.00 | 20,580.00 | 14,525.00 |
| Annuity | 599,857.40 | 0 | 599,857.40 |
| Accounts receivable: | | | |
| 1. Eppler, Guerin & Turner, Inc | 73,116.50 | 73,116.50 | 0 |
| 2. Other | 2,725.98 | 2,725.98 | 0 |
| Other recs., def. dividends, deposits, and escrow accts | 56,337.37 | 56,337.37 | 0 |
| Corporate stocks: | | | |
| 1. C. L. Siewert & Sons | 76,157.87 | 76,157.87 | 0 |
| 2. Other | 112,400.00 | 112,400.00 | 0 |
| Other investments | 506,974.26 | 506,974.26 | 0 |
| S Lazy S Ranch and improvements | 900,460.00 | 900,460.00 | 0 |
| Machinery and equipment (net) | 22,693.75 | 22,693.75 | 0 |
| Furniture and fixtures (net) | 1,826.24 | 1,826.24 | 0 |
| Livestock | 312,822.37 | 312,822.37 | 0 |
| Gross community property estate | 3,331,358.75 | 2,617,429.31 | 713,929.44 |
| Claimed community property liabilities: | | | |
| Attorney and accountant fees payable | (18,808.18) | (18,808.18) | 0 |
| Bank overdraft | (456,652.36) | (456,652.36) | 0 |
| Other | (140,790.80) | (140,790.80) | 0 |
| Total community property liabilities | (616,251.34) | (616,251.34) | 0 |
| Net community property estate | 2,715,107.41 | 2,001,177.97 | 713,929.44 |

The S Lazy S Ranch (the ranch) listed on the property

schedule at a value of $900,460 consisted of 21,911 acres of which 16,372 acres were owned by petitioner and Helen. The remaining 5,539 acres were owned by C. L. Siewert & Sons, a corporation in which petitioner and Helen in community and their three sons, respectively, held one-fourth interests. The value of the ranch was computed by multiplying petitioner's and Helen's acreage times $55. This $55-per-acre figure had been used by the owners of comparable land adjacent to the ranch as the offering price or actual sale price of their land.

Because of losses in 1970 and 1971 in the amounts of $172,564.51 and $159,477.10, respectively, and expected future losses, valuation of the ranch was difficult. Other ranches in the vicinity of the ranch were also experiencing operating difficulties. In order to compensate for and to help offset expected losses, the parties explored assigning a dollar amount as an "advantage" to be given to whichever party took the ranch. At one point in the negotiations, a figure of $250,000 was considered. However, the final agreement did not include such a provision.

During the negotiation of the agreement, petitioner and Helen did not discuss the expected cost to petitioner, or the corresponding benefit to Helen, from petitioner's assumption of the two contingent liabilities referred to in provisions 6 and 8 of the agreement.

Petitioner and Helen, either jointly or individually, entered into numerous transactions prior to and shortly after their divorce which affected the property division. Among those transactions were the following:

(1) On April 29, 1972, petitioner paid $599,857.40 to the Prudential Insurance Co. of America for the annuity (provision 2(d) of the agreement) which was allocated to Helen. The payment created an overdraft in petitioner's and Helen's community account with the Plains National Bank, Lubbock, Tex. (the bank), and as of May 2, 1972, the amount of the overdraft remaining was $456,652.36. Petitioner was a member of the bank's board of directors and conducted a large amount of business with the bank.

(2) On or immediately prior to the issuance of the divorce judgment, petitioner and Helen sold for $162,589.76 their stock in Colorado Interstate Gas Co., General Motors Corp., Lone Star Gas Co., and El Paso Natural Gas Co. The stock was allocated to

petitioner in the agreement but, since it was sold prior to the divorce, the stock was not included in the property schedule. Of the total consideration for the stock's sale, $89,473.26 had been received prior to May 2, 1972, and was applied to reduce the bank overdraft. The remainder of the sales proceeds (i.e., $73,116.50), listed on the property schedule as an account receivable from Eppler, Guerin & Turner, Inc., the brokerage firm which handled the stock sales, was received shortly after the divorce and was used to further reduce the overdraft.

(3) Shortly after the divorce, petitioner liquidated certificates of deposit totaling $480,000, which were listed on the property schedule as an asset of the community allocated to petitioner. Part of this money was used to pay off the remainder of the bank overdraft.

(4) On May 2, 1972, as required by provision 3 of the agreement, petitioner paid Helen's attorneys $10,600 to cover her legal expenses associated with the divorce. The $10,600 amount is included under the item titled "Attorney & Accountant Fees Payable" on the property schedule.

(5) On the morning of May 2, 1972, prior to the divorce judgment, petitioner received a loan of $100,000 and executed two $50,000 notes to the bank. As required by provision 2(c) of the agreement, petitioner paid the $100,000 proceeds to Helen on that same day. Also on May 2, 1972, Helen received from petitioner, pursuant to the same provision in the agreement, a $100,000 note payable to her in three equal annual installments beginning on May 3, 1973, together with interest at the rate of 4 percent.

Petitioner's accountants, L. Edmund Smith and Dave Bumpus (the accountants), prepared his 1972 Federal income tax return on the assumption that there was a pre-divorce partition in kind of the community property and, after the divorce, a sale by Helen to petitioner of part of her former community property. Since the transaction was treated in part as a purchase of Helen's assets, the accountants recomputed the basis of the noncash-equivalent assets which petitioner received in the transaction. Under their calculations, the total basis of these assets was $607,317.45 less than it would have been had Helen's basis in the assets been carried over to petitioner. The accountants used the resulting lower basis in petitioner's 1972 return on Schedule C, Profit (or Loss) From Business or Profession, in

computing depreciation expense and cost of livestock sold expense and on Form 4797, Supplemental Schedule of Gains and Losses, in computing ordinary gain on disposition of breeding stock.

Subsequently, petitioner's attorney, Clarence P. Brazill, Jr., prepared petitioner's amended 1972 income tax return on the theory that there was only a division of community property between petitioner and Helen and, therefore, the basis of the community property received from Helen carried over to petitioner. Since the carryover basis was higher than the basis used on the initial 1972 return, the amended return showed on Schedule C an increased depreciation expense of $10,894.55, an increased cost of nonbreeding livestock sold of $22,736.86, and, on Form 4797, a decreased ordinary gain on disposition of breeding stock of $1,206.84. The total claimed overpayment in petitioner's income tax for 1972 is $21,288.07.[2]

## OPINION

### Issue 1. Basis of Assets Acquired in Property Settlement

On May 2, 1972, petitioner and his former wife, Helen, entered into a property settlement agreement which was incorporated in the divorce decree entered on that date. At that time the gross value of the community estate was $3,331,358.75, and its liabilities amounted to $616,251.34. Under the terms of their agreement, petitioner and Helen agreed that the community assets would be divided, each taking the whole of specified items as his or her separate property, and that petitioner would make certain payments to her. The principal issue to be decided is whether, as contended by petitioner, there was a nontaxable partition of the community estate or, as contended by respondent, there was a taxable sale or exchange of assets. The resolution of this issue is fundamental to the determination of petitioner's adjusted basis for the property he acquired in the property settlement.

Where divorcing spouses in community property States make an approximately equal division of the entire community property, the partition is nontaxable, and the basis of the

---

[2]Respondent in his notice of deficiency determined that a corporation made payments in the amount of $4,509.52 to petitioner or for his benefit. These payments were determined to be gross income to petitioner, and the taxability of such payments is not in issue in the instant case.

property set aside to each spouse is its basis to the community prior to the division. *Carrieres v. Commissioner*, 64 T.C. 959, 964 (1975), affd. per curiam 552 F.2d 1350 (9th Cir. 1977). But not every division of community property is nontaxable. Where one spouse receives property having an aggregate value equal to substantially more than half the value of the entire community property, the transaction is a taxable one and a basis adjustment may be required. *Long v. Commissioner*, 173 F.2d 471, 474 (5th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court, cert. denied 338 U.S. 818 (1949); *Rouse v. Commissioner*, 159 F.2d 706, 707 (5th Cir. 1947), affg. 6 T.C. 908 (1946); see *Johnson v. United States*, 135 F.2d 125, 130 (9th Cir. 1943). Similarly, where one spouse gives his note or other separate property for a substantial portion of the other spouse's community property set aside to him, the transaction may be a taxable one requiring a basis adjustment. *Edwards v. Commissioner*, 22 T.C. 65, 69–70 (1954); *Carrieres v. Commissioner, supra* at 964.

We think it is clear that petitioner and Helen did not merely divide their community property. Of the total assets of the community, petitioner received property with a net value of $2,001,177.97, and Helen received assets valued at $713,929.44. In addition, Helen received (1) cash of $100,000, representing the proceeds of a loan which petitioner obtained from the bank by giving two notes on the date of the divorce, (2) a note from petitioner in the amount of $100,000, and (3) the benefit of petitioner's assumption of community indebtedness of $616,251.34.[3] Both the notes to the bank and the note to Helen, as well as a part of the assumed liabilities, were to be paid from petitioner's separate funds. Since petitioner received substantially more than half of the community property and agreed to pay large sums to Helen from his separate property or income, we think the transaction was not merely an exchange of properties of approximately equal value but was one which requires a basis adjustment.

Petitioner makes a valiant effort to show that there was an

---

[3] As discussed *infra* in the text, the assumed liabilities of $616,251.34 included a bank overdraft of $456,652.36 which was in reality a factor in a community transaction which had not been completed at the time of the divorce and which should be offset against the cash or cash equivalent assets allocated to petitioner. If this is done, the assumed community liabilities are reduced to $159,598.98. This adjustment does not affect the disparity in the amounts received by the respective spouses in the property settlement.

approximately equal division of the community estate which he computes as follows:

| | |
|---|---:|
| 1. Gross value of community assets .............. | [1]$3,431,358.75 |
| 2. Less liabilities ...................................... | [1]716,251.34 |
| 3. Net community estate ............................. | 2,715,107.41 |
| 4. Helen's one-half.................................... | 1,357,553.71 |
| 5. Amount actually received by Helen........... | 913,929.44 |
| 6. Difference............................................. | 443,624.27 |

[1]Petitioner included in the "Gross value of community assets" figure the $100,000 cash which he received from the bank on May 2, 1972. The corresponding $100,000 indebtedness, reflecting the two $50,000 notes which petitioner executed to the bank, is included in the liability figure. As discussed in the text, *infra*, we do not think the $100,000 in cash is part of the community estate.

Petitioner would adjust this difference for the fact that Helen was relieved of substantial potential losses from the continued operation of the ranch, for petitioner's guarantee that C. L. Siewert & Sons, Inc., will receive a minimum of $498,458.28 and a maximum of $527,346.39 in the event the ranch is sold, and for petitioner's obligation to provide each of his and Helen's sons with a college education. When the property he received is adjusted for those items, petitioner argues, there was an approximately equal division of the community property.

All three of these adjustments, however, are contingent liabilities which would not benefit Helen personally. Moreover, the value of the ranch used in the property settlement negotiations was determined by the parties in the light of the asking or actual sale price of nearby similar properties. We are not convinced from the evidence of record that the value used in the settlement negotiations did not reflect the anticipated losses, particularly since the value of the ranchland used in the negotiations was substantially less than the community's basis for such land. Similarly, there is no showing that the contingent obligation to C. L. Siewert & Sons, Inc. (of which petitioner himself owned 25 percent of the stock and his sons the other 75 percent), on the sale of the ranch was a factor in the negotiations. And there was no way of determining the extent of the obligation which petitioner assumed in agreeing to provide funds for a college education for his sons. At the time of the divorce, the parties did not know what college costs the sons

would incur. We are satisfied that petitioner received substantially more than half of the community property.[4]

Moreover, as reflected in our findings, we think Helen received only $713,929.44 of the community assets. Petitioner's computation of $913,929.44 as the share she received includes (1) the $100,000 note which petitioner gave Helen on May 2, 1972, and (2) the $100,000 in cash which petitioner borrowed and gave Helen in connection with the settlement. Neither one of these items was community property.

According to paragraph 2(c) of the settlement agreement, the $100,000 note payable to Helen was to be paid in three annual installments of $33,333.33 each plus interest, beginning on or before 1 year from the entry of the divorce decree. Since this note was to be paid after the divorce became final, its payment was to come from petitioner's income or property outside the community. Cf. *Edwards v. Commissioner, supra* at 69; *Hilderbrand v. Lumbroff*, 140 S.W.2d 317, 318 (Tex. Civ. App. 1940).

As to the cash in the amount of $100,000 paid to Helen at the settlement, it was obtained by petitioner by giving two $50,000 notes to the bank on May 2, 1972. Under Texas law, "property possessed by either spouse during or upon dissolution of the marriage is * * * [presumed to be] community property." *Lindsey v. Lindsey*, 564 S.W.2d 143, 146 (Tex. Civ. App. 1978); *Horlock v. Horlock*, 533 S.W.2d 52, 60 (Tex. Civ. App. 1975); Tex. Fam. Code Ann. sec. 5.02 (Vernon 1970). This presumption prevails where property is acquired on credit even if the community debt is subsequently paid with separate assets. *Bradley v. Bradley*, 540 S.W.2d 504, 512 (Tex. Civ. App. 1976). Here, however, the presumption is not applicable. The $100,000 was borrowed from the bank on petitioner's credit, not on the credit of the community. The notes to the bank were executed only hours before the divorce and were to be paid subsequent to the divorce. It is evident that the bank expected them to be paid by petitioner, not the community. In such circumstances, the

---

[4]Obviously, all three of these contingent liabilities—the potential losses from the ranch, the possible liability to C. L. Siewert & Sons, Inc., and the college education for the sons—were payable from petitioner's separate property and, under the rationale of *Edwards v. Commissioner*, 22 T.C. 65, 69–70 (1954), in any event would be regarded as further consideration for the sale of Helen's interest in part of the community assets. Moreover, the guaranteed payment to C. L. Siewert & Sons, Inc., and the provision for the college education of the sons were "of as much interest to petitioner as to his wife" and "cannot be assumed to have been * * * consideration for the later settlement of their community property rights." *Rouse v. Commissioner*, 6 T.C. 908, 913 (1946), affd. 159 F.2d 706 (5th Cir. 1947).

$100,000 borrowed from the bank was not a community liability but was petitioner's separate liability. *Ray v. United States*, 385 F.Supp. 372, 377–378 and n. 3 (S.D. Tex. 1974); *Cockerham v. Cockerham*, 527 S.W.2d 162, 171 (Tex. 1975); *Elliott v. Elliott*, 328 P.2d 291, 295 (Cal. App. 1958); *Kenney v. Kenney*, 274 P.2d 951, 960 (Cal. App. 1954). Helen thus did not receive this $100,000 from the community but received it as consideration from outside the community for her relinquishment of her interest in part of the community property.

Similarly, under the same principle, petitioner agreed to pay, and hold Helen harmless from, all community indebtedness (other than Federal income tax liability) as of May 1, 1972. Those debts (other than the $456,652.36 overdraft) amounted to $159,598.98. It was anticipated that petitioner would pay them out of property allocated to him or out of his subsequent earnings. His assumption of Helen's share of these debts, amounting to $79,799.49, was additional consideration which he gave for her interest in the community assets.

The $456,652.36 overdraft at the bank had a unique status. Prior to the divorce, an annuity costing $599,857.40 had been bought for Helen from the Prudential Insurance Co. of America, and petitioner wrote a check for that amount on the community account. The bank covered the check even though it temporarily created a $546,125.62 overdraft. Prior to their divorce petitioner and Helen had sold some community stock and had received only part of the sales proceeds before May 2, 1972. The proceeds they had received were applied against the overdraft. The remainder, listed as an accounts receivable on the property schedule, was subsequently received and along with part of the proceeds from the liquidation of the certificates of deposit was applied to the balance of the overdraft. In the property settlement the value of the annuity was treated as a community asset allocated to Helen. The certificates of deposit as well as the account receivable for the stock were treated as community property allocated to petitioner, and the overdraft was treated as a liability assumed by petitioner.

As we view the annuity purchase and overdraft, this was a community transaction which was not completed until after the divorce. For the purposes of resolving the issues raised by the present controversy, it is more realistic to treat the transaction as if it had been completed before the property settlement was

effected with the results that petitioner's cash and cash equivalent assets should be reduced by the $456,652.36 required to pay the overdraft and the community liabilities which petitioner assumed should exclude the amount of the overdraft, leaving assumed community liabilities in the amount of $159,598.98.

Our conclusion that the settlement was not an approximately equal division of the community property is confirmed by the action of both parties. Helen's representatives admittedly sought to structure the transaction so that she would be entitled to a deductible loss. And petitioner, on his income tax return for 1972, prepared almost a year after the divorce, wrote down the basis of the assets he received by $607,317.45 to reflect an unequal division of the community property. While petitioner, before he initiated the present controversy, filed an amended return in which he recomputed his basis as if there had been an equal division of the community property, his initial treatment of the transaction on his original return is some evidence of what the parties intended to accomplish in their settlement. See *Waring v. Commissioner*, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court.[5]

Since the property settlement was not an approximately equal division of the community assets, it is necessary to recompute petitioner's basis for the property he acquired in the settlement. His basis, of course, includes one-half of the community's basis in the assets of which he obtained full ownership under the settlement agreement. For Helen's interest in the assets of which he acquired full ownership, he gave consideration consisting of (1) noncommunity cash of $100,000 which he borrowed from the bank, (2) his note for $100,000 payable to her, (3) the fair market value of petitioner's share of the assets, computed at $356,964.72, which Helen acquired under the settlement, and (4) assumption of Helen's share in the amount of $79,799.49 of the community liabilities (other than the $456,652.36 overdraft which, as discussed above, should be applied to reduce the cash assets petitioner acquired in the settlement). This consideration, totaling $636,764.21, should be included in petitioner's basis for

---

[5]Petitioner argues, alternatively, that there was a substantially equal division of all assets except the ranch and that only Helen's interest in it was purchased. Cf. *Carrieres v. Commissioner*, 64 T.C. 959, 964 (1975), affd. per curiam 552 F.2d 1350 (9th Cir. 1977). We have carefully weighed the evidence presented in this respect and have concluded that it would not support a realistic finding to that effect.

the assets acquired from the community. See *Long v. Commissioner, supra* at 474; *Rouse v. Commissioner, supra* at 912, 159 F.2d at 707.[6] It should be allocated first to the one-half of the cash and cash equivalent items which were obtained by petitioner from the community and the balance to the noncash items proportionately.

We do not agree with petitioner's contention that his basis in the community assets which he acquired in the settlement should be augmented by amounts reflecting anticipated losses from operating the ranch, the guarantee that on the sale of the ranch C. L. Siewert & Sons, Inc., will receive a stated amount, and the expected college expenses of petitioner's sons. These items were not payable to, or for the benefit of, Helen. At most, if any one of these items can be regarded as part of the consideration of Helen's share of the community property, petitioner's obligations were contingent ones and as such the amounts thereof may not be added to petitioner's basis. Cf. *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 179 (1973); *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834, 848–849 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966), cert. denied 385 U.S. 827 (1966); *Redford v. Commissioner*, 28 T.C. 773, 778 (1957); *Benn v. Commissioner*, T.C. Memo. 1963–151, affd. per curiam 366 F.2d 778 (5th Cir. 1966).

### *Issue 2. Section 267(d) Nonrecognition of Gain*

Petitioner argues that if the division was a taxable purchase and sale transaction, he is entitled to nonrecognition of gain pursuant to section 267(d) with respect to those assets sold or disposed of in 1972. We agree.

Section 267(a)(1)[7] provides that no deduction shall be allowed in respect of losses from sales or exchanges of property between husband and wife. Section 267(d)[8] prescribes the rule to

---

[6]See also M. Walker, "Tax Consequences of Divorce in New Mexico," 5 N. Mex. L. Rev. 233, 244 (1975).

[7]SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.

(a) DEDUCTIONS DISALLOWED.—No deduction shall be allowed—

(1) LOSSES.—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

[8]Sec. 267(d) provides as follows:

(d) AMOUNT OF GAIN WHERE LOSS PREVIOUSLY DISALLOWED.—If—

(1) in the case of a sale or exchange of property to the taxpayer a loss sustained by the transferor

be applied where a loss has been disallowed to the transferor by reason of section 267(a)(1): upon the sale or other disposition by the transferee-taxpayer at a gain, "such gain shall be recognized only to the extent that it exceeds so much of such loss as is properly allocable to the property sold or otherwise disposed of by the taxpayer." We think section 267(d) is applicable here.

Respondent contends that petitioner and Helen were no longer husband and wife when her losses were incurred and that, therefore, Helen's losses and petitioner's gains are recognizable. He argues that the property settlement agreement provided that it was contingent upon the granting of a divorce between the parties, and that had the parties not been divorced the property settlement agreement would have no force or effect.

It is true that the agreement was contingent upon grant of a divorce, but this fact does not render section 267 inapplicable. The sale transaction occurred simultaneously with the entry of the final divorce judgment. It did not occur after petitioner and Helen had been divorced. Under Texas State law, the divorce court has the duty to order a division of the community estate (Tex. Fam. Code Ann. sec. 3.63 (Vernon 1970)), and it may, as was done here, incorporate in its divorce decree a property settlement agreement entered into by the spouses. *Eagle Lumber Co. v. Trainham*, 365 S.W.2d 702, 704 (Tex. Civ. App. 1963). The agreement here was made an integral part of the divorce decree, see *Ex Parte Preston*, 347 S.W.2d 938, 940 (Tex. Civ. App. 1961), and it took effect at, not after, the time of the decree. We conclude that section 267(d) applies, and any gain on the 1972 sales of what was previously community property should be adjusted accordingly. We do not read the cases cited by respondent, *McKinney v. Commissioner*, 64 T.C. 263 (1975), and *Merritt v. Commissioner*, 47 T.C. 519 (1967), affd. 400 F.2d 417

---

is not allowable to the transferor as a deduction by reason of subsection (a)(1) (or by reason of section 24(b) of the Internal Revenue Code of 1939); and

   (2)  after December 31, 1953, the taxpayer sells or otherwise disposes of such property (or of other property the basis of which in his hands is determined directly or indirectly by reference to such property) at a gain,

then such gain shall be recognized only to the extent that it exceeds so much of such loss as is properly allocable to the property sold or otherwise disposed of by the taxpayer. This subsection applies with respect to taxable years ending after December 31, 1953. This subsection shall not apply if the loss sustained by the transferor is not allowable to the transferor as a deduction by reason of section 1091 (relating to wash sales) or by reason of section 118 of the Internal Revenue Code of 1939.

(5th Cir. 1968), as supporting a contrary conclusion. Cf. *Deyoe v. Commissioner*, 66 T.C. 904, 913–915 (1976).

Respondent argues only that the divorce preceded the sale and, therefore, petitioner and Helen were not related parties within the meaning of section 267. We are aware that some commentators have suggested that section 267 does not apply to sales transactions in connection with divorces. We note, however, the broad statement in *McWilliams v. Commissioner*, 331 U.S. 694, 699 (1947), as follows:

[The predecessor of sec. 267] states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups.

In *Merritt v. Commissioner*, 400 F.2d at 421, the court said:

We do not read Section 267 as seeking out devils alone. The basic legislative command of the section is that losses incurred from family transactions are not to be taxable events. This blanket approach relieves the taxing authorities of many complicated and complex melioristic decisions in family transactions. Through we do not applaud harsh results * * * we recognize that simplicity can be a valid congressional rationale for banning transactions by type.

For the reasons stated in the text we think petitioner and Helen were husband and wife when the sale occurred and that section 267 applies.

To reflect the foregoing,

*Decision will be entered under Rule 155.*